**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE SU, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | : : : : | |
| Plaintiff, | : : | CIVIL ACTION No. 20-4265 |
| v. | : : | |
| BENE MARKET, LLC, *et al,* | : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**SCHMEHL, J.  /S/JLS**                                    **MARCH 19, 2024**

I.       **INTRODUCTION**

   This matter was filed by the United States Secretary of Labor ("Plaintiff") on August 31,

2020, against Bene Market, LLC, National Brokers of America, Inc., Alan Redmond and

Stephanie Miller ("Defendants"). Plaintiff claims that Defendants violated various provisions of

the Fair Labor Standards Act of 1938, as amended 29 U.S.C. § 201, *et seq.*, including failing to

pay minimum wage and overtime and failing to maintain proper records. Plaintiff further claims

that the violations were willful, liquidated damages should be enforced, and an injunction is

necessary to ensure that Defendants comply with the FLSA in the future.

   Plaintiff has filed a motion for partial summary judgment, Defendants filed a motion for

summary judgment, the parties' submitted a Joint Statement of Undisputed Material Facts, and

argument was held. For the reasons set forth below, I will grant Plaintiff's motion for partial

summary judgment and deny Defendants' motion for summary judgment.

## II.  FACTUAL BACKGROUND

This matter stems from an investigation by the Department of Labor's Wage and Hour Division into the pay practices of National Brokers of America, Inc. ("NBOA") and Bene Market that began in 2018. (Joint Stipulation of Undisputed Facts ("Stip. Facts") at ¶7). Both entities sold and serviced insurance plans in as many as 50 states over the telephone from call centers in Reading, PA (Stip. Facts at ¶¶18, 20; ECF 82-5, Redmond dep., pp. 27-29, 48, 50, 59, 84.) Attached to Plaintiff's Complaint as Exhibit A is a list of 318 current and former employees of Defendants who are allegedly owed back wages and an equal amount of liquidated damages. (ECF 1, Ex. A.) The parties stipulated that NBOA and Bene Market employees were covered by the FLSA at all times relevant to this proceeding. (Stip. Facts at ¶6.)

Alan Redmond was the sole owner of NBOA, owned 96% of Bene Market, and is the CEO of both entities (ECF 82-5, Redmond dep. at p. 16; ECF 84-1, Requests for Admissions, ¶¶ 3-4.) Stephanie Miller was the Chief Financial Officer of Bene Market. (Stip. Facts at ¶27; ECF 84-7, Miller dep., at p. 24.) NBOA had previously been investigated by the Wage and Hour Division in 2016, after which NBOA was advised that its pay practices violated the overtime and minimum wage provisions of the FLSA, and Defendants agreed to come into compliance and paid $62,531.00 in back wages to 124 employees in 2017. (ECF 82-1, Declaration of Mowday at ¶¶ 2-3.)

When Wage and Hour initiated a second investigation of NBOA in 2018, Defendants' in-house counsel told the agency that NBOA no longer existed, and that Redmond was operating another insurance brokerage called Bene Market. (*Id*. at ¶4) Defendants continued to advertise as NBOA / Bene Market throughout 2018 and into 2019. (ECF 82-1, Mowday dec. at ¶5.) Twenty-

nine of the thirty-eight employees who worked at NBOA during its last pay period in 2017 worked at Bene Market during its first pay period. (ECF 82-3, NBOA Pay Stubs; ECF 82-4, Bene Market Pay Stubs.) There were only three employees on Bene Market's first payroll that were not on NBOA's last. (*Id*.; ECF 84-1, Requests for Adm. at ¶15; ECF 84-2, Defs' Ans. to Interrogatories at ¶ 24.) Both companies were in Reading, PA, they used the same accountants to process their payroll, and both were insurance brokerages selling health, life, vision, and dental insurance plans over the telephone in multiple states. (Stip. Facts at ¶¶2, 3, 18, 26; ECF 84-1, Requests for Adm. at ¶¶18, 20; ECF 84-2, Ans. To Interrogatories at ¶24; ECF 88, Anderson 30(b)(6) dep at 70; ECF 85-1, Walsh dep. at 24; ECF 82-5, Redmond dep. at 47.)

NBOA purchased "leads" which were used to contact individuals interested in purchasing health or dental insurance. (Stip. Facts at ¶9.) When employees were hired, NBOA would send them an "offer letter." Defendants produced offer letters dated September 2015 through July 2017 listing NBOA as the employer. (Stip. Facts at ¶12.)  The last pay period for which NBOA issued pay stubs was December 10 through December 23, 2017. (Stip. Facts at ¶13.) NBOA filed for bankruptcy prior to the filing of the Complaint in this matter. (Stip. Facts at ¶14.)

The first pay period for which Bene Market issued paystubs was December 24, 2017, through January 15, 2018. (*Id*. at ¶ 15) Accounting firm Malcolm Smith and Associates prepared payroll checks and pay stubs listing gross pay, withholdings, and net pay for each employee on the payroll using the data submitted to them by Defendants in excel spreadsheets every two weeks (*Id*. at ¶26).

Stephanie Miller helped devise the pay practices at Bene Market and key performance indicators for some positions (*Id*. at ¶28). Redmond consulted Miller when implementing new

pay structures. (Stip. Facts at ¶ 29) Miller provided input when Redmond was considering how to pay Bene Market employees and determining whether Bene Market employees would be exempt or non-exempt. (*Id*. at ¶30)

Defendants failed to respond to Requests for Admissions in this matter, and all requests were therefore deemed to be admitted. Some of the relevant admissions are as follows: Defendants admitted that they did not pay their employees an overtime premium for hours over 40 in a work week, during the relevant time. (ECF 84-1, Req. for Adm. at ¶10) Defendants were the employers of the individuals listed on Schedule A to the Complaint during the relevant time period. Both Defendants Redmond and Miller controlled the work schedules of Defendants' employees during the relevant time period. (*Id.* at ¶¶5-6.) Redmond determined the rate of pay for employees listed in Schedule A to the Complaint and Miller participated in said determination. (*Id.* at ¶¶8-9.) Defendants paid their employees a fixed amount every two weeks, regardless of the number of hours each employee worked, during the relevant time period. (*Id*. at ¶11.) During the relevant time period, Defendants failed to keep accurate records of the hours their employees worked and there were occasions where Defendants failed to pay their employees the minimum wage (*Id*. at ¶¶23-24.)

During the Wage and Hour investigation of this matter, as well as during the instant federal litigation, Defendants produced various documents, including payroll records. Payroll was produced from NBOA with a pay date of April 22, 2016. (ECF 83-1.) This record, which covered the pay period from April 4 to April 16, 2016, and was produced in the Wage and Hour Investigation in this matter, shows over forty employees who are not listed as "overtime exempt." (ECF 83-1.) These employees have wildly different hourly rates of pay, ranging from $37.15 (W. Corchado, line 23) to $7.25 (H. Gaither, line 32.) (*Id*.) A close examination of this

payroll record reveals that each employee's hourly rate was generated by dividing "base pay" by the sum of regular hours and overtime hours. (*Id.*) This calculation gave the appearance of compliance with overtime regulations, when in fact the employees were being paid straight time for all hours worked. This same pattern is reflected in a payroll worksheet dated May 20, 2016, as well as one dated December 31, 2018. (ECF 84-4, 5/20/16 payroll worksheet, K. Deleon, line 27; ECF 82-2, 12/31/18 payroll record.) A February 11, 2019, payroll report shows that Defendants switched to a 100 hour pay period and continued to calculate employees "per hour" rate by dividing Gross Pay by 100, which was the fixed schedule for this time period. (ECF 85-5.) This pattern continues in payroll reports for June 3, 2019, (ECF 84-6), February 10, 2020 (ECF 83), May 9, 2020 payroll report (ECF 83-2), and June 15, 2022 payroll (ECF 85-3).

Discovery has also revealed that NBOA and Bene Market had fixed schedules and employees who were unable to work the full schedule were not paid for "missed hours." (ECF 85-1, Walsh dep. at 22; ECF 85-2, Redmond 30(b)(6) dep; ECF 88, Anderson 30(b)(6) dep. at 95-96; ECF 84-7, Miller dep. at 56-57). The payroll records indicate that employees who missed time and did not have available paid time off had their pay reduced for every "missed hour." (ECF 82-5, Redmond dep. at 144; ECF 85-6, 1/20 to 2/2 payroll report; ECF 85-2, Redmond 30(b)(6) dep at 205-206; ECF 84-7, Miller dep at 57.) Employees who missed time and did not have paid time off available had their pay reduced for each hour missed; this was denoted as "missed hours" on Defendants' payroll records. (ECF 84; Feb. 11, 2019, payroll; ECF 85-2, Redmond 30(b)(6) dep at 57, 99; ECF 88, Anderson 30(b)(6) dep at 30.) Defendants' February 11, 2019, payroll shows that Defendants paid a purported salary that was reduced for each hour missed out of the regular schedule; Defendants calculated an "equivalent hourly rate," which was used to determine how much to reduce employees' salary for missed hours. (ECF 84.)

Employees who missed time and had accrued paid time off were able to use that time off to cover missed hours, rather than having their pay reduced. (ECF 88, Anderson 30(b)(6) dep. at p. 133; ECF 82-5, Redmond dep. at p. 144; ECF 85-3, 6/15/2020 payroll.) Formulas in the payroll documents show Defendants paid straight time for all hours worked (See, e.g., ECF 83-2, 4/26/to 5/9/2020 payroll, p. 1, Gross Pay (K5) is the sum of Hourly Rate (H5) * Time Worked (I5); *id*. at p. 2, Gross Pay for the Verification Department employee in row 17 is the sum of Deductions (J17) times Hr. Rate (k17) plus Sat Hrs (H17) times Sat Rate w/OT (L17)).

Defendants' policy was not to pay overtime unless employees worked more than the fixed biweekly schedule in a pay period—at one point this was 100 hours, then later the fixed biweekly schedule became 94.5 hours. (ECF 88, Anderson dep. at 95-96; ECF 84, 2019 payroll records at line 18.) The payroll documents produced during the investigation for October 21 through March 9, 2020, show a fluctuating hourly rate that is rounded to 6 decimal places. (ECF 83, Feb. 2020 payroll records.) For the period March 23 to June 15, 2020, Defendants paid straight time for all hours worked on the face of the records—the "per hour" rate is calculated by dividing Gross Pay by 100, the fixed schedule for this time period. (ECF 84, Feb. 11, 2019, payroll at 1-2.) Defendants paid straight time for all hours worked, and this can be seen on the records. (ECF 83, Feb. 2020 payroll records.) At NBOA and Bene Market bonuses were not included in the regular rate nor used to compute overtime (ECF 84-4, 5/20/16 payroll.) Where Defendants paid employees based solely on production, (ECF 84, 2/19/22 payroll), they did not pay these workers an overtime premium for hours worked over 40. (*Id.*) A close examination of the 2/19/22 payroll shows that Hunter LaCross, for example, worked 85.05 hours, but is paid "the greater of call ready time or production" with no provision for overtime. (ECF 85-4, 2/19/22

payroll.)  The June 3, 2019, payroll report also reflects approximately fourteen employees to whom Defendants failed to pay the minimum wage for that pay period. (ECF 84-6.)

III.   **LEGAL STANDARD**

On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted).  Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted).  Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

IV.     **DISCUSSION**

The FLSA is a remedial statute designed to abolish substandard labor conditions, including protecting workers from substandard wages and oppressive hours. 29 U.S.C. § 202(a); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945); *Parker v. NutriSystem, Inc*., 620 F.3d 274, 279 (3d Cir. 2010) (citations omitted). The remedial, humanitarian purpose of the FLSA requires its provisions to be interpreted and applied liberally. *Brock v. Richardson*, 812 F.2d 121, 123-24 (3d Cir. 1987).

In the instant matter, Plaintiff moves for partial summary judgment as to liability, arguing that based upon the record before this Court, Defendants clearly violated the FLSA by failing to pay proper overtime, failing to pay a minimum wage, and failing to comply with the FLSA's recordkeeping requirements. Defendant also moves for summary judgment, arguing that Plaintiff must provide individualized proof of FLSA violations and that numerous employees are exempt under Section 213 of the FLSA. I will discuss each motion below.

A.     **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

First, there is no dispute that the FLSA applies to Defendants in this matter, as they have stipulated to such. (Stip. Facts at ¶¶4, 6) Therefore, Defendants' employees are covered by the overtime and minimum wage protections of the FLSA (Stip. Facts at ¶18). 29 U.S.C. §§ 206(a) and 207(a).

1.     **Overtime Violations**

First, Plaintiff argues that Defendants violated Section 7 of the FLSA when they allegedly paid employees straight time for all hours worked, including overtime hours. Section 7(a) of the FLSA forbids an employer from employing any worker "for a workweek longer than forty hours unless such employee receives compensation … at a rate not less than one and one-

half times the [worker's] regular rate" for the excess hours. 29 U.S.C. § 207(a)(1). See *Brock v. Claridge Hotel and Casino*, 846 F.2d 180, 183 (3d Cir. 1988), cert. denied, 488 U.S. 925 (1988).

Specifically, Plaintiff alleges that Defendants violated section 7 in 5 different ways: (1) Defendants paid workers a fixed amount for their scheduled hours, but created records showing straight time and overtime rates that they "backed into" to disguise the fact that they did not pay overtime rates for hours worked over 40 in a work week; (2) Defendants paid a purported salary for all hours worked (including overtime hours) in a biweekly schedule that was reduced by the "equivalent hourly rate" for hours missed during that pay period; (3) Defendants paid a straight time hourly rate for all hours worked during the fixed bi-weekly schedule; (4) Defendants paid employees based upon production but failed to pay overtime for hours worked over 40 in a work week; and (5) Defendants failed to include non-discretionary bonuses in the rate paid for overtime hours. I will examine each argument in turn.

**a. Defendants "backed into" hourly rates to disguise that they did not pay overtime.**

Defendants produced payroll records during the investigation and discovery in this matter that showed non-exempt workers whose hourly rates fluctuated based upon the number of hours worked. This is improper rate manipulation done to make it appear as if Defendants complied with the FLSA's overtime requirements when Defendants actually paid these workers a fixed amount for all their scheduled hours during the workweek but reduced it if the employees worked fewer hours. The amount listed in "Actual Gross Pay" was not arrived at by using the hourly rate—the formulas in the Excel spreadsheets show that "Actual Gross Pay" was the sum of base pay, bonus, and any payroll correction. (ECF 83-2, pp. 1-2). Rather than calculating gross pay with the employee's hourly rate, the hourly rate was calculated after the fact by dividing gross pay by the sum of regular hours and overtime hours times 1.5. (*Id*.) Defendants

were paying these employees a fixed amount for their scheduled workweek, reduced if the employee worked fewer hours – but generated records to make it appear that they were being paid the proper overtime rate. This type of "backing in" to what appear to be compliant rates is an FLSA overtime violation. 29 C.F.R. § 778.500. Further, Defendants made no attempt to explain the manufactured hourly rates that were apparent from their payroll records. Accordingly, I find Defendants violated the FLSA by not properly paying overtime to employees who worked over 40 hours in a work week.

**b. Defendants claimed to pay employees a salary but reduced the salary for hours missed.**

Next, Plaintiff alleges Defendants paid a fixed total amount for a workweek, even if that week exceeded 40 hours, which resulted in Defendants paying these employees the same rate for all hours worked, even overtime hours. This also would result in a violation of section 7 of the FLSA.

In response to this, Defendants argue that many of their employees were exempt and therefore properly paid on a salary basis. However, this argument is unpersuasive, because true salaried employees cannot have their pay reduced by the number of hours missed in a week, as Defendants did in the instant matter. In a case where an alleged "salaried" employee's schedule with Defendants required them to work more than 40 hours in a week, this was a violation of the overtime provisions of the FLSA. See *Brock*, 846 F.2d at 186-87 (finding that casinos supervisors are compensated on an hourly and not a salary basis when they received a "weekly salary guarantee" of $250 for any week they worked, but then were paid hourly once they reached the number of hours necessary to meet this threshold, and had absences deducted at an hourly rate; therefore, these supervisors were not exempt from the FLSA overtime requirements.) The record in this matter clearly shows that Defendants reduced pay for allegedly salaried

employees who missed work hours. Further, Defendants do not dispute that they reduced pay for missed time for employees who were allegedly salaried; they merely argue that because the records only show 2 employees with missed hours, there is insufficient "representative evidence" of FLSA violations. This argument is unavailing, as Defendants would first have to prove that these employees are salaried, which they have not done. Accordingly, these employees were not true salaried employees and Defendants were required to pay them overtime if they worked more than 40 hours in a week. As Defendants failed to pay overtime to these employees, they committed violations of section 7 of the FLSA.

### c. Defendants occasionally paid straight time for all hours worked during a fixed bi-weekly schedule

There are numerous pay periods in which Defendants simply paid straight time for all hours worked during the fixed biweekly schedule and those violations are clear from the records. (ECF 84, Feb. 11, 2019, payroll; ECF 83, 2/2020 payroll.) During her 30(b)(6) deposition, HR Manager Amela Anderson agreed that Defendants did not pay overtime if employees worked less than 94.5 hours in the biweekly pay period. (ECF 88, Anderson 30(b)(6) dep.) This practice clearly violates the FLSA's overtime provisions.

### d. Defendants paid workers based upon production but did not pay overtime for hours worked over 40 in a work week.

Even where employee earnings are determined on a piece-rate, salary, or commission basis, employers must still pay overtime compensation based on the regular hourly rate the employee receives during each workweek. This regular hourly rate is determined by dividing the employee's total compensation for employment in any workweek by the total number of hours worked in that workweek. 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.109 (regular rate is an hourly rate); 29 C.F.R. §§ 778.117-118 (commissions must be included in the regular rate and included

in overtime compensation). Defendants did not pay an overtime premium to workers who were paid based upon their performance (for instance, a percentage of the number of sales made or the number of cancelations averted etc.) and worked more than 40 hours in a work week. (ECF 85-4, 2/19/22 payroll.) This practice violated the FLSA because all non-exempt workers who work more than 40 hours in a work week must be paid an overtime premium for hours worked over 40 in a work week, even when paid based on production. See e.g. 29 C.F.R. §§ 778.117-118.

**e. Defendants failed to include non-discretionary bonuses in the rate of pay for overtime hours.**

The regular rate of pay includes "all remuneration for employment paid to, or on behalf of, [an] employee," which includes non-discretionary bonuses. 29 U.S.C. §207(e). "When an employee earns a nondiscretionary cash award or bonus (as opposed to discretionary cash awards or bonuses as described in § 551.511(b)(3)), the bonus must be taken into account in determining overtime pay for the period of time during which the bonus was earned." 29 CFR 778.211. At no time during the period relevant to this matter did Defendants incorporate bonus amounts into the hourly rate paid for hours worked over 40 in a work week. This is clear on the face of the payroll records. (ECF 85-4, Feb. 19, 2022 payroll.) For the payroll records where Defendants backed into the hourly rate, bonuses were not included in the regular rate, rather, they were added to the base pay to produce "Actual Gross Pay." (ECF 82-2, 12/31/18 payroll; ECF 84-4, 5/20/16 payroll) For the payroll where employees were paid a purported salary that was reduced by hours missed, bonus amounts were not included in the regular rate but added to the final check. (ECF 84, 2/11/19 payroll.) Where Defendants paid straight time for all hours worked in the biweekly schedule, bonuses were again simply added to the final check (ECF 83-2, 5/9/20 payroll; ECF 85-3, 6/15/20 payroll.) As these bonuses were linked to production, (ECF 84-4, 5/20/16 payroll; ECF 84-3, Barrera dep. at 26-27; ECF 88, Anderson 30(b)(6) dep. at 69, 71, 73) and therefore

12

nondiscretionary, they needed to be included in the regular rate, not just added on to the final pay amount. 29 C.F.R. § 778.211 ("individual or group production bonuses . . . must be included in the regular rate of pay").

Defendants admit that bonuses were not included in overtime rates paid to employees but argue that the bonuses they paid were discretionary and not production-based, and therefore, were not eligible to be included in the overtime calculation. However, multiple employees and officers of Defendants testified that the bonuses were production based. (ECF 88, Anderson 30(b)(6) dep. at 71-74; ECF 84-3, Barrera dep. at 26-27; ECF 84-7, Miller dep. at 49-50.) These bonuses were clearly production based and Defendants failed to add them into the regular rate of pay, resulting in yet another violation of the FLSA.

For the many reasons discussed above, Defendants clearly committed overtime violations under section 7 of the FLSA. Accordingly, summary judgment will be granted to Plaintiff as to Defendants' liability on said overtime violations.

### 2.    Minimum Wage Violations

A review of the record in this matter illustrates numerous occasions when certain employees earned so little that their effective hourly rate fell below the federal minimum wage of $7.25 an hour. (ECF 84-1, Req for Admissions; ECF 84-3, Defs' Ans to Interrogatories; ECF 84-6, 6/3/19 payroll.) This violation is evident from the record. In addition, Defendants' briefing in this matter did not address these minimum wage violations, and Defendants' counsel informed the Court at oral argument that they are not disputing the minimum wage violations. Accordingly, summary judgment is granted as to the Section 6(a) violations of the FLSA.

### 3.    Recordkeeping Violations

Section 11(c) of the FLSA requires that "Every employer … shall make, keep, and preserve such records of the persons employed by him…" 29 U.S.C. § 211(c). Employers must maintain and preserve records for at least three years. 29 C.F.R. §§ 516.2, 516.5(a). Payroll records for employees subject to Section 7 must include, *inter alia*, their regular hourly rate of pay, daily and weekly hours worked, total weekly straight-time earnings, total weekly overtime premium pay, and total wages paid each pay period. 29 C.F.R. § 516.2(a). The burden is on the employer to keep accurate wage and time records. *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984).

In the instant matter, the record shows that Defendants failed to keep accurate records of employee regular rates, straight time and overtime pay. Multiple examples set forth in detail above show Defendants' rate manipulation and "backing into" employees' hourly rates. This type of activity resulted in Defendants failing to keep accurate records. Accordingly, summary judgment is granted as to the Section 11 recordkeeping violations.

### 4.    Redmond and Miller are Personally Liable for Violations

Liability for FLSA violations extends to "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). District courts in this circuit have found that "overwhelming case law" permits claims for individual employer liability under the FLSA to proceed against a corporate officer with operational control over employees. *Burroughs v. MGC Servs., Inc.*, 2009 WL959961, at *4 (W.D. Pa. Apr. 7, 2009.) A corporate officer who was personally responsible for a violative practice is also liable as an "employer." *Jackson v. Art of Life, Inc.*, 836 F.Supp.2d 226, 235 (E.D. Pa. 2011.) Redmond and Miller were "employers" pursuant to section 3(d) of the FLSA. They both admitted as much in their

discovery responses. (ECF 84-1, Req. for Adm., ¶¶2, 7; ECF 84-2, Defs' Ans to Interrogatories, ¶24.) In response to this argument, Defendants merely argue that because there are "genuine disputes of material fact as to whether wage and hour violations occurred in the first place," it is not appropriate to decide the individual liability of Redmond and Miller at this time. (ECF 91, p. 17.) However, as previously discussed there are multiple wage and hour violations in this matter, and I find that Redmond and Miller are personally responsible for said vioaltions. Accordingly, summary judgment is granted in favor of Plaintiff as to the issue of Redmond and Miller's personal liability.

     **5.**     **Bene Market is a successor in interest to NBOA.**

The following factors must be considered when determining whether an employer is a successor in interest in an FLSA matter: "(1) continuity in operations and work force of the successor and predecessor employers; (2) notice to the successor-employer of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief directly." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 150–51 (3d Cir. 2014) (citations omitted).

     **a.**     **The transition from NBOA to Bene Market was nearly seamless.**

Redmond established both NBOA and Bene Market in Reading, Pennsylvania and operated both call centers from there. (ECF 82-5, Redmond dep. pp 27-28, 59, 97-98; ECF 84-1, Req for Adm. ¶ 18; ECF 84-2, Ans to Interrogatories, ¶ 24.) He was the majority owner of both companies, owning 100% of NBOA and 96% of Bene Market. (ECF 84-1, Req for Adm. ¶¶3-4, 13; ECF 84-2, Ans to Interrogatories, ¶24; ECF 82-5, Redmond dep. at 16.) Employees at both companies were employed to sell insurance policies, provide customer service for those policies, and perform billing and collection services on those policies. (Stip. Facts ¶18; ECF 82-5, Redmond dep. at 29, 48, 50, 84, 97-98; ECF 84-1, Req for Adm. ¶ 18; ECF 84-2, Ans to

Interrogatories, ¶ 24.). Redmond testified that NBOA and Bene Market sold mostly the same products from some of the same insurance carriers. (ECF 82-5, Redmond dep. at 97-100.) They were structured in the same way and had many of the same positions. (ECF 82-5, Redmond dep. at 97-100; ECF 84-1, Req. for Adm. ¶¶16, 18, 20; ECF 84-2, Ans to Interrogatories, ¶24; ECF 88, Anderson 30(b)(6) dep. at 70.)

Redmond estimated that NBOA ceased operations at the end of 2017 and that Bene Market started doing business within days of NBOA's closure. (ECF 82-5, Redmond dep.at 94-95.) The paystubs produced in discovery show no break in operation—Bene Market started paying workers on December 24, 2017, and the pay period on NBOA's last paystub ended on December 23, 2017. (Stip. Facts ¶¶ 13, 15). Further, the company's workforce remained largely continuous when the change occurred. (ECF 82-3, NBOA Last paystubs; ECF 82-4, Bene Market first paystubs.) 29 of the 38 employees that were on NBOA's last payroll appear on Bene Market's first payroll, and there are only three employees on Bene Market's first payroll that were not on NBOA's last. (*Id.*) In addition, HR Manager Amela Anderson testified that long-time employees were still identified on Bene Market payroll with their NBOA email as their login ID. (Stip. Facts ¶22.). Redmond implemented the same policies and procedures at NBOA and Bene Market (Stip. Facts ¶19), and new hires signed the same Policies and Procedures form at both entities (*Id*.). Bene Market continued to advertise as NBOA/Bene Market and would refer to NBOA accomplishments in its social media posts. (ECF 82-1, Mowday Dec. ¶7, Ex A to Dec.) All of this evidence leads to the conclusion that the transition from NBOA to Bene Market was virtually seamless.

**b.** **Bene Market was aware of NBOA's payment obligations under the FLSA.**

Bene Market had notice of its potential back wage liability as NBOA's successor in interest. Redmond was the majority owner of both NBOA and Bene Market and was the individual responsible for Defendants' FLSA violations. Accordingly, Bene Market was on notice through Redmond of NBOA's unlawful pay practices and its potential liability for them. Redmond was on notice regarding the overtime and minimum wage requirements of the FLSA following the 2016 Wage and Hour investigation into NBOA's pay practices, pursuant to which Defendants paid NBOA employees $62,531.00 in back wages. (ECF 82-1, Mowday dec. ¶¶ 2-3.)

**c.** **NBOA is unable to satisfy its obligation to employees owed back wages.**

Since NBOA is no longer operating and has filed for bankruptcy, this entity is likely unable to satisfy an award of back wages and liquidated damages. (Stip. Facts ¶34.) As such, I find that Bene Market is a successor in interest to NBOA and should assume its debts in this matter.

**6.** **Defendants' violations of the FLSA were willful.**

A violation of the FLSA is considered willful if the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the legality of the conduct. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Although willfulness is generally a question of fact, the issue can be treated as a question of law where "'there is no legally sufficient evidentiary basis for a reasonable jury to find for' the non-moving party." *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 528 (W.D. Pa. 2021) (citations omitted). In *Fusion*, the Court found that Defendants' self-serving deposition testimony was insufficient to create a genuine issue of material fact regarding willfulness—Defendants had been investigated on three separate occasions and each investigation revealed near identical overtime and

recordkeeping violations. Here too, Defendants have been investigated previously and overtime and minimum wage violations have been found on the face of the records at locations owned and operated by Defendant Redmond. Redmond reviewed the payroll records every pay period before they were sent to the accountants. (ECF 88, Anderson 30(b)(6) dep. at 28-33.) Defendants' accountant testified that he advised them to pay an hourly rate and overtime. (ECF 91-1, Sardella dep. at 94.) As a result of the previous investigation and repayment, as well as advice received from his accountant, Redmond was clearly aware of the need for his company to comply with minimum wage and overtime regulations and simply chose not to do so. Accordingly, I find that Defendants' FLSA violations are willful.

## B. **DEFEDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants also move for summary judgment in this matter, claiming that Plaintiff failed to provide individualized proof of FLSA violations, that many of their employees were exempt from the FLSA's overtime requirement, and that Plaintiff's request for injunctive relief is moot because both NBOA and Bene Market are no longer operating. (ECF 78-2 at 3-4.)

### 1. **Plaintiff is Not Required to Provide Evidence of FLSA Violations for Each Individual Employee.**

Defendants first argue that Plaintiff must provide "individualized proof of FLSA violations," and Plaintiff has failed to "allege wage and hour violations on a case-by-case basis." (ECF 78-2 at 5.) However, this argument misconstrues the burden of proof. It has been established that representative testimony may support an award to non-testifying employees. *Dole v. Solid Waste Servs., Inc.*, 733 F. Supp. 895, 926 (E.D. Pa. 1989), aff'd, 897 F.2d 521 (3d Cir. 1990), and aff'd sub nom. *Appeal of Solid Waste Servs., Inc.*, 897 F.2d 524 (3d Cir. 1990). Therefore, I find that Plaintiff has provided sufficient representative testimony from which

reasonable inferences of hours worked and amounts actually paid may be drawn, and

Defendants' motion for summary judgment as to this issue is denied.

### 2.      Defendants Cannot Prove the Employees at Issue Are Exempt Employees

Next, Defendants argue that many of the employees at issue is this matter are exempt

employees to whom they are not required to pay overtime. First, as pointed out by Plaintiff,

Defendants failed to plead employee exemptions as affirmative defenses in their answer to the

complaint. Having failed to plead affirmative defenses in their answer, Defendants have waived

their ability to raise them now. *See Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1214-15 (11th

Cir. 2010). Defendants' summary judgment motion can be denied on that basis alone.

As to the merits of Defendants' motion alleging employee exemptions, Defendants bear

the burden of proving that their workers were exempt from the overtime and minimum wage

protections of the FLSA. *Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir. 2008)

(citations omitted). This Defendants cannot do, as discovery has shown that they do not pay

employees a true salary, and therefore, they cannot meet their burden of proof regarding

exemptions.

"To qualify as an exempt executive, administrative or professional employee under

section 13(a)(1) of the Act, an employee must be compensated on a salary basis at a rate of not

less than $684 per week." 29 C.F.R. § 541.600(a). All the exemptions that Defendants claim are

applicable to their employees incorporate the salary basis test defined at 29 C.F.R. § 541.602. To

satisfy this requirement, an employee must receive a pre-determined amount constituting all or

part of his compensation, "which amount is not subject to reduction because of variations in the

quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Furthermore, "the employee

must receive his full salary for any week in which he performs any work without regard to the

number of days or hours worked." 29 C.F.R. § 541.602(a)(1). Defendants' pay practices do not meet these requirements, as it was Defendants' practice to reduce employees' pay for hours missed in a workday. (ECF 84-4, 5/20/16 payroll.) Defendants' corporate representative, Amela Anderson, testified to Defendants' practice of reducing employee pay for hours missed each pay period during her 30(b)(6) deposition. (ECF 88, Anderson 30(b)(6) dep. at 28-30, 32, 41, 44.) Anderson testified that one of her duties was to input the hours missed by each employee during each pay period into the payroll spreadsheets for the owner's review. *Id.* Redmond testified that Defendants would calculate the amount to be deducted from employee pay for hours missed by dividing salary by the fixed biweekly schedule and then multiplying that amount by the number of hours missed. (ECF 82-5, Redmond dep. at 143-44). Accordingly, Defendants did not pay their employees on a true salary basis and their employees were therefore not exempt.

The regulations also state as follows: "An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." *Higgins v. Bayada Home Health Care Inc.*, 2021 WL 4306125, at *7 (M.D. Pa. Sept. 22, 2021), aff'd sub nom. *Higgins v. Bayada Home Health Care Inc.*, 2023 WL 2518345 (3d Cir. Mar. 15, 2023). Because Defendants made improper deductions from their employees' salaries, they clearly did not intend to pay employees on a salary basis, their employees are not exempt, and Defendants were required to pay proper overtime and minimum wage amounts to their employees. Accordingly, summary judgment will be denied to Defendants on this issue.

### 3. Plaintiff's Request for Injunctive Relief is Not Moot

Lastly, Defendants argue that Plaintiff's request for injunctive relief is moot because NBOA and Bene Market are no longer in business. Defendants have not proven that Bene Market ceased operations and, even if this were true, the individual Defendants should still be enjoined from future FLSA violations. Redmond was the owner and individual ultimately responsible for overtime and minimum wage violations at both NBOA and Bene Market. As such, injunctive relief is warranted in this case. See *Solis v. A-1 Mortgage*, 934 F.Supp.2d 778, 815-16 (W.D. Pa. 2013) (finding that injunctive relief was appropriate even though the defendant company was now "defunct" in a case where defendants had a history of violating the FLSA). Therefore, Defendants' motion for summary judgment is also denied as to the request for dismissal of injunctive relief.

## V. <u>CONCLUSION</u>

For all the above reasons, Plaintiff's partial motion for summary judgment will be granted and Defendants' motion for summary judgment will be denied. An appropriate order follows.