BRUCE L. CASTOR, JR.
ATTORNEY ID NO.: 46370
TIMOTHY E. POSSENTI
ATTORNEY ID NO.: 76478
VAN DER VEEN, HARTSHORN, LEVIN & LINDHEIM
1219 Spruce Street
Philadelphia, PA 19107
(215)-546-1100
bcastor@mtvlaw.com
tpossenti@mtvlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EUGENE SCALIA, SECRETARY OF LABOR　:
UNITED STATES DEPARTMENT OF LABOR　:
　　　　　Plaintiff,　　　　　　　　　　:　Civil Action no. 5:20-cv-4265
　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
BENE MARKET, LLC, NATIONAL BROKERS:
OF AMERICA, INC, ALAN REDMOND, and　:
STEPHANIE MILLER　　　　　　　　　:

## DEFENDANT STEPHANIE MILLER'S MOTION TO OPEN AND/OR STRIKE SUMMARY JUDGMENT

Defendant, Stephanie Miller (hereinafter "Miller'), by and through her attorneys, hereby files the following motion to open and/or strike summary judgment in the above captioned case:

### I.　　Procedural History

1. On August 31, 2020, a complaint was filed by the United States Secretary of Labor ("Secretary") against the above captioned defendants alleging violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §201, *et seq.*

2. The Secretary named Miller as an individual defendant in her *personal* capacity.

3. The Secretary never served Miller individually with the complaint nor any other documents during the course of this litigation.

4. Five attorneys have entered their appearance for *all* defendants at various points in this litigation. A *sixth* attorney, William Rush, Esquire represented Miller at a telephone deposition that was taken by Jennifer L. Bluer, Esquire for the United States Department of Labor on April 29, 2021 (hereinafter "Miller's deposition"). A copy of Miller's deposition is attached as **Exhibit "A"** and incorporated by reference.

5. Miller never engaged counsel in this case because she did not know she needed counsel. No lawyer ever presented Miller with an engagement letter, nor did she sign any engagement letter and/or fee agreement/contract for legal services in connection with this case.

6. All attorneys acting on behalf of defendants were hired by Bene Market, LLC (hereinafter "Bene") or National Brokers of America, Inc. (hereinafter "NBoA") or Alan Redmond (hereinafter "Redmond").

## II.    Grounds to Open and/or Strike Judgment

7.    Fed. R. Civ. P. 60(b) states as follows:

**Rule 60(b). Grounds for Relief from a Final Judgment, Order, or Proceeding.**

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

8.      While seeking to hold her personally liable separate and apart from the corporate defendants, the Secretary never served Miller with legal papers in this case including the complaint.  As such, the judgment entered against her individually should be declared void for lack of due process.  See Fed. R. Civ. P. 60(b)(4). Rule 60(b)(6) also allows relief for "any other reason that justifies relief."

9. At Miller's deposition, the following line of questions and answers occurred between Counsel for the Secretary and Miller:

BY MS. BLUER:

Q.  So the next question says (referring to verified answers to interrogatories in aid of deposition):  Describe separately in detail all the facts that form the basis of or in which defendants rely in support of any affirmative defenses listed in their answer to the complaint in this matter or that defendant intend to raise going forward.  And your response is that:  Answering Defendant cannot reply to this question as she had no part in answering the complaint referenced and in no way participated in such answer. Do you see that?

A. Yes, I do.

Q. So does this mean that you need to file an answer in this case, that your—your position is that the answer that was filed so far does not apply to you?

A. I have—I have never seen—the first—the first I have seen of this was when the questions were given to me, which was last week.

[some difficulties with audio during remote proceeding],

At this point, Mr. Rush states:

MR. RUSH: Okay. The answer to this complaint was filed whenever it was filed, before I was even aware this case existed without any discussion with Ms. Miller. She in no way contributed to the answer that has long ago been filed.

Miller's deposition, p.145, line 19 to p. 146, line 17 and p.147, lines 4-10.

Q. You haven't seen the complaint?

A. No. I wasn't even aware of the complaint.

Miller's deposition, p.153, lines 6-8.

10.     Due process, under the Fifth and Fourteenth Amendments to the U.S. Constitution, guarantees that no person shall be deprived of life, liberty, or property without due process of law. In a lawsuit, an individual must be given notice and an opportunity to be heard before a Court should enter a judgment against that person.

11.     Miller believed Miller's deposition was regarding the continuing issues that Bene and NBoA and Redmond were having with the U.S. Department of Labor. She did not know this was a lawsuit wherein she was named individually.

12.     Miller became aware of this lawsuit when told by Norm M. Valz, Esquire on March 27, 2025.  Mr. Valz told Miller she must sign a document immediately and return it to him. He further told her the document pertained to Redmond's bankruptcy, but when she read a copy of the paperwork, she saw that it was a Joint Stipulation regarding damages that contained the case caption showing her as a named defendant. Whereupon Miller retained present counsel. A copy of said Joint Stipulation is marked **Exhibit "B"**, attached hereto and made a part hereof.

13.     Defendants, without Miller's involvement or approval, failed to respond to Requests for Admissions in the case and all requests were therefore deemed to be admitted. *See* Memorandum Opinion of the Honorable Jeffrey L. Schmehl, dated March 19, 2024, p.4.

14.     One such admission held that "Redmond determined the rate of pay for employees listed in Schedule A to the complaint and Miller participated in said determination. *See* ECF 84-1, Req. for Adm. at ¶¶8-9.

III. **The Court should open and/or strike the judgment because Miller has a meritorious defense and never had an opportunity to advance it.**

15.    Miller role as CFO was titular only.

16.    Miller's 4% share of Bene was given to her by Redmond because he felt badly that he had lost her $50,000.00 investment in NBoA.

17.    Under the FSLA and case law, claims for individual liability extend to any person acting directly or indirectly in the interest of an employer in relation to an employee. 29 U.S.C. §203(d).

18.    At Miller's deposition, she testified:

Q. And what part of your job caused you to be involved with the payroll records?

A. For a while—for a while I helped Mr. Redmond and Mr. Butler on developing key performance indicators. Or basically he developed them for all employees. So because of that, you know, I would have some interface with that at times. It wasn't directly with payroll in producing it. It was more in assigning the KPIs were going to be for the different people based on what, you know, Mr. Redmond instructed.

Q. When you were helping Mr. Redmond with the KPI, did you help develop the compensation scheme that they were using to pay employees?

A. No. I didn't develop it, no.

Q. Did you help put in place policies for how employees would be paid?

A. No.

Miller's deposition, p.36, lines 1-22.

19.    *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462 (3d Cir. 2012) (also cited as 2012 U.S. App. LEXIS 13229), the Third Circuit

articulated the following four-factor test to determine joint employer status under the FLSA, calling it the Enterprise test:

1) the alleged employer's authority to hire and fire the relevant employees;

2) the alleged employer's authority to promulgate work rules and   assignments and to set the employees'   conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

3) the alleged  employer's involvement  in day-to-day  employee supervision, including employee discipline; and

4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

The court emphasized that these factors are not exhaustive and that courts should consider any other evidence of significant control over the employees. Thus, individual liability under the FLSA is determined by the degree of operational control an individual has over employment practices, rather than merely their title or position within the company. Miller had no such operational control and Bene or NBoA.

20.    To be an employer under the FSLA, a supervisor "must either be involved in the day-to-day operation or have some direct responsibility for supervision of the employee. *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986). Miller had no such involvement or direct responsibility.

21.    A supervisor's involvement includes "control over 'significant aspects of the company's day-to-day functions, **including compensation of employees** and other matters in relation to an employee.'" *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir. 2013). [**emphasis added**]. Miller did not develop the compensation scheme that they were using to pay employees, nor did she help put in place how employees would be paid.

22. In his Memorandum Opinion, Judge Schmehl wrote: "District courts in this circuit have found that 'overwhelming case law' permits claims for individual employer liability under the FLSA to proceed against a corporate officer with operational control over employees. Citing *Burroughs v. MGC Servs., Inc.*, 2009 WL95961, at *4 (W.D. Pa. Apr. 7, 2009.).

23. Miller has a valid and meritorious defense against the claims against her as an individual that she could not advance in her defense.

24. As evidence that Redmond admits he completely controlled the company, Miller has an Indemnification Agreement between Miller and Alan Redmond executed June 26, 2018, holding Miller harmless for any debt, and indemnifying Miller for any costs or losses incurred as a result of the debt and liabilities of entities owned by Redmond. A copy of said Indemnification Agreement between Stephanie Miller and Alan Redmond is marked **Exhibit "C",** attached hereto and made a part hereof.

25. No counsel for the defendants offered this Indemnification Agreement in this case to show that not only did Miller have no say in the running of this business, Redmond acknowledged that fact, and addressed the possibility that someone might mistakenly believe that Miller did maintain some level of control and attack her as has happened in the present case.

26. ABA Model Rule 1.7 – Conflict of Interest: Current Clients states: A lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict exists if: 1. Direct adversity: (a)(1) The representation of one client will be directly adverse to another client; or 2. Material limitation: (a)(2) There is a significant risk that the lawyer's ability to represent one client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by the lawyer's own interests.

27.    Miller had a claim (as one client) against another client (Redmond) in the same litigation in this proceeding before the tribunal.

28.    Miller had a separate and distinct defense that was not offered. Miller believes and therefore avers, that Redmond simply directed the entire case defense all without the knowledge of Miller and in a manner adverse to her, and the Secretary failed to recognize this obvious conflict and serve process and otherwise treat Miller distinctly from Redmond and the other Defendants.

**WHEREFORE**, for all of the foregoing reasons, defendant Miller respectfully requests this Honorable Court strike and/or open the summary judgment entered against her at the above caption number and for all such other relief that is just and proper.

Respectfully Submitted,

**VAN DER VEEN, HARTSHORN, LEVIN & LINDHEIM**

May 30, 2025

By:    /s/ Bruce L. Castor, Jr.
Bruce L. Castor, Jr.


By:    /s/ Timothy E. Possenti
Timothy E. Possenti

# EXHIBIT A

STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
1–4

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - -

MARTIN J. WALSH,
SECRETARY OF LABOR,
UNITED STATES DEPARTMENT
OF LABOR,

        Plaintiff,

    -vs-

BENE MARKET, LLC,
NATIONAL BROKERS OF
AMERICA, INC., ALAN
REDMOND, and STEPHANIE
MILLER,

        Defendants.

) Civil Action No.
) 5:20-cv-04265

- - - -

REMOTE DEPOSITION OF:  STEPHANIE MILLER

- - - -

      DATE:  April 29, 2021
           Thursday, 9:45 a.m.

  REPORTED BY:  Kristin Lytle, RPR
          Notary Public
          Reference No.  KL77522

## Page 2

REMOTE DEPOSITION OF STEPHANIE MILLER, a witness, called by the Plaintiff for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Kristin Lytle, RPR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, on Thursday, April 29, 2021, commencing at 9:45 a.m.

APPEARANCES:

    REMOTELY FOR THE PLAINTIFF:
    Jennifer L. Bluer, Esq.
    bluer.jennifer.l@dol.gov
    U.S. DEPARTMENT OF LABOR
    Office of the Solicitor
    1835 Market Street
    Mailstop 22/SOL
    Philadelphia, PA  19103
    215.861.5146

    REMOTELY FOR THE DEFENDANTS:
    William Rush, Esq.
    wrush@rushlawberks.com
    RUSH LAW GROUP
    38 North 6th Street
    Reading, PA  19601

    ALSO PRESENT:
    Jason Mowday, Department of Labor

## Page 3

\* I N D E X \*

Examination by Ms. Bluer  - - - - - - -  4
Examination by Mr. Rush   - - - - - - -  170

Certificate of Court Reporter - - - - - 172
Errata Sheet  - - - - - - - - - - - - - 173

\* INDEX OF EXHIBITS \*

Exhibit 1 - advertisement  - - - - - - - 130
Exhibit 2 - Indeed.com advertisement - - 133
Exhibit 3 - Mighty Recruiter ad  - - - - 133
Exhibit 4 - sign-in sheets - - - - - - - 140
Exhibit 5 - Interrogatories  - - - - - - 142

## Page 4

STEPHANIE MILLER,
having been duly sworn,
was examined and testified as follows:

- - - -

EXAMINATION

- - - -

BY MS. BLUER:

Q.   Good morning, Ms. Miller.  My name is Jennifer Bluer, and I'm an attorney with the Department of Labor Regional Solicitor's Office.  And I will be taking your deposition today.

    I'm joined by Jason Mowday.  He's the Assistant District Director of the Wage and Hour Division's Wilkes-Barre office.

    Would you please state your full name and spell your last name for the record, please.

A.   Do you need my middle name?

Q.   Sure.

A.   Or is just initial okay?

    Stephanie Miller, M-I-L-L-E-R.

Q.   And Ms. Miller, what is your middle



**Page 5**

name?

A.   Farris, F-A-R-R-I-S.

Q.   And can you tell us your address, please.

A.   485 Knorr Road, K-N-O-R-R, Gettysburg 17325.

Q.   So this is a virtual deposition that we're having today.  And that means that we're not all in the same room together.  We're all participating with our computers, which is not the way we normally do it.  We would normally all be sitting around a table.

I'm going to ask everybody who is observing to please mute their computers, and that will eliminate the feedback and so that you and I can hear each other and we don't hear everything else.

If anybody is having connection issues, if you leave the meeting and rejoin, that should solve the problem.  Sometimes if there's a lot of people pulling on the same Internet connection and it's wireless,

**Page 6**

it can slow everything up.  But if you leave and come back, that seems to have worked.

Where are you today, Ms. Miller?

A.   I am in Reading, Pennsylvania.

Q.   And are you by yourself?

A.   I am in the same room as Attorney Rush.

Q.   Is there anybody else present?

A.   No.

Q.   Is this a space where you will be uninterrupted?

A.   Yes.  As a matter of fact, I can lock the door if you would like.

Q.   Do you have a cell phone with you?

A.   I do but it is muted.

Q.   Good.  If you could just put that to one side and not use it during the deposition, that would be great.

Are you able to communicate by email or messaging on your computer that you're using?

A.   Yes.

Q.   If you could just make sure those functions are closed out and that

**Page 7**

you're not communicating with anybody while we are having our deposition so that it's just you testifying and you're paying attention to my questions and I'm paying attention to your answers.

A.   Hold on.

- - - -

(There was a brief pause in the proceedings.)

- - - -

THE WITNESS:  Everything is cleared out.

BY MS. BLUER:

Q.   Very good.

So what's going to happen today is I'm taking your deposition.  That means that I'm going to ask you questions, and you're going to answer to the best of your ability.  And the court reporter is taking down everything that we're saying.

The court reporter has placed you under oath.  And the oath that you swore gives your testimony the same force and effect as if you were

**Page 8**

testifying in court.

Do you understand that?

A.   Yes, I do.

Q.   This means that you are obligated to tell the whole truth based upon your personal knowledge.

Do you understand?

A.   I do.

Q.   There are a couple of things that we can do to make the deposition go smoothly.  The first thing is if you wait for me to finish my questions before you start to answer, and I will try to wait for you to finish your answers before I ask another question, and that way we will get a nice clean record.  Especially when we're doing a deposition via Zoom, which is the platform that we're using right now, the court reporter won't be able to get everything if we talk over each other because Zoom can only broadcast one voice at a time.

Also, if you could make sure that instead of shaking your head or



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
9–12

Page 9

saying uh-huh, if you could give a verbal response like yes or no or some other verbal answer. That way we can keep the record clear because those things don't show up very well on the record.

A.   Okay.

Q.   If you don't hear a question, let me know, and I will repeat it. If you don't understand a question, just let me know, and I will rephrase it. If you go ahead and answer the question, we're going to assume that you heard the question and you understood the question.
     Does that make sense?

A.   Yes, it does.

Q.   If you need a break, just let me know, and we will take one. We all understand this can be tiring. I just ask that you finish answering whatever question is pending before you take that break. Okay?

A.   Absolutely.

Q.   Please don't go and discuss your

Page 10

testimony after your deposition with anybody in the office. I know you're in the office where you work. This is just like testifying in court. We want your testimony and your memories. If there's something that we can perhaps show you to help refresh your recollection if you're having trouble remembering something, we can try to do that. But let's make sure we're getting your testimony and not anybody else's. Okay?

A.   Okay. Sounds good.

Q.   Have you taken any medication or consumed any alcohol or any other substance that might affect your ability to understand my questions and answer truthfully and completely?

A.   No.

Q.   Is there any other circumstances that you're aware of that would prevent you from giving accurate and truthful information -- answers and understand my questions?

A.   No.

Page 11

Q.   Do you understand all of the instructions?

A.   I do.

Q.   I am going to quickly leave this meeting and rejoin because my computer is freezing. So I'm going to jump out and jump back in, and then we will get started. Okay?

A.   Yes.

         - - - -

(There was a recess in the proceedings from 9:51 a.m. to 9:53 a.m.)

         - - - -

BY MS. BLUER:

Q.   Have you ever been deposed before?

A.   Yes.

Q.   And what were the circumstances that you were deposed?

A.   I'm not sure. It was something with work, but I do not recall exactly what it was. It's been a long time.

Q.   How long ago was that?

A.   Probably a few years.

Q.   A few years did you say or two years?

A.   A few years.

Page 12

Q.   A few years. More than five?

A.   No. Because I haven't worked here for that long. I'm trying to think on what it was concerning. Oh, it was concerning a bankruptcy, a bankruptcy.

Q.   Bankruptcy of the company that you were working for?

A.   National Brokers of America.

Q.   And do you remember who took your deposition?

A.   I think it was Attorney Bambrick.

Q.   He was the person asking you questions in the deposition?

A.   I believe so. I believe so.

Q.   Do you know what the outcome of that matter was?

A.   No. I really don't. I was not overly involved with NBoA.

Q.   What did you do in preparation for your deposition today?

A.   I just answered your questions that were presented to me.

Q.   I'm sorry. Could you say that again?

A.   I answered the questions that were presented to me.



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
13–16

Page 13

Q. Questions presented by your attorney?
MR. RUSH: The Interrogatories.
A. The Interrogatories.
BY MS. BLUER:
Q. I see. So you reviewed the Interrogatory responses; is that what you mean?
A. I prepared them, yes. I answered them.
Q. I see. So to get ready for our conversation today, did you look at any documents?
A. No, I did not.
Q. Did you speak to anybody other than your attorney about your testimony today?
A. No, I did not.
Q. Did you take any notes in preparation for your testimony today?
A. No.
Q. Did you bring any documents with you for your testimony today?
A. No, I did not. I just found out about it last week.
Q. I'm sorry. I think we were talking

Page 14

over each other. Could you --
A. I apologize. I just found out about this last week.
Q. You just found out about this deposition last week?
A. Yes.
Q. The Interrogatories that you just showed me did you bring those with you?
A. Yes.
Q. And there wasn't anything else other than the Interrogatory responses?
A. No.
Q. Have you had any conversations with Alan Redmond about your deposition?
A. No.
Q. Have you had any conversations with Arthur Walsh about your deposition?
A. No. I just asked him when it was, and he did not know.
Q. Let's talk about your background first. What is your educational background?
A. I'm sorry. You cut out.
Q. What is your educational background?
A. I have degree in -- a bachelor's degree.

Page 15

Q. In what subject?
A. Economics.
Q. And when did you get that?
A. 1979.
Q. And where did you get that?
A. University of Maryland, Baltimore County Campus.
Q. Do you have any other degrees or professional qualifications?
A. I am a certified public accountant.
Q. And when did you earn that?
A. 1988.
Q. And from which institution?
A. It's not an institution. It's with the Pennsylvania State Board of Accountancy.
Q. Any other qualifications or professional certifications?
A. I did get my license for selling insurance in the State of Pennsylvania.
Q. When did you get that?
A. I'm trying to think. It was either 2017 or 2018. No, actually, I think it was 2019. Sorry. I'm trying to think. I believe it was at the beginning of

Page 16

2019.
Q. '19?
A. (Witness nods head up and down.)
Q. Before you went to work for National Brokers of America, where did you work?
A. I worked for a company called Gettysburg Health Administrators, Inc.
Q. And what did they do?
A. They were a third-party administrator of insurance.
Q. And how long did you work there?
A. About 25 years.
Q. And what did you do for them?
A. Basically general accounting. I'm trying to think. I interacted with the independent CPA firm.
Q. With who? Sorry.
A. The independent CPA firm that worked for that company. I was the liaison. And I did a lot of reporting -- insurance reporting for insurance carriers for clients that they had on the books.
Q. Were you responsible at all for payroll at that company?



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
17–20

Page 17

A.   No.

Q.   And when did you go to work at National Brokers of America?

A.   I don't know what my start date was. We -- I did not really start working for them I believe until 2016. Although, I was in discussions with Mr. Redmond about the potential to work.

Q.   When did you first start your negotiations with Mr. Redmond?

A.   Probably June of 2015.

Q.   And did he approach you or did you approach him?

A.   Actually, the owner of the company I had worked with prior knew Mr. Redmond, and it was through an opportunity that they wanted to go in together. They were talking about it, and I just was included because Mr. -- the owner of the other company wanted me involved.

Q.   What was the name of the other company?

A.   Ronald Pack.

Q.   How do you spell his name?

A.   P-A-C-K.

Page 18

Q.   What was his title?

A.   I don't know if he actually had a title. He was the owner of the company.

Q.   What was your job title at that company?

A.   It changed but I would say basically it was controller.

Q.   Control?

A.   Controller.

Q.   Controller. What was the opportunity that Mr. Pack was pursuing with Mr. Redmond that you were involved in the discussions?

A.   I think he wanted to invest in National Brokers of America.

Q.   Do you know if he actually did that?

A.   Yes.

Q.   And did he do that?

A.   Yes.

Q.   Did Gettysburg Health Administration continue in operation after the investment?

A.   No. And just for the record, it's

Page 19

Administrators.

Q.   Administrators. So did Mr. Pack close the company after making the investment?

A.   No. He was already -- the company -- that company went bankrupt if I recall correctly. They lost a lot of contracts.

Q.   So that company went bankrupt, and Mr. Pack invested in National Brokers of America?

A.   A very minor investment, yes.

Q.   Do you know how much the investment was?

A.   I believe it was 4 -- 4 percent. And it was under a company he formed called Plan Z.

Q.   Plan Z?

A.   Z as in zebra.

Q.   So are you saying that Mr. Pack took a 4 percent ownership of NBoA?

A.   Plan Z did.

Q.   And when I say NBoA, I mean National Brokers of America.

A.   I understand.

Page 20

Q.   What year was it that Plan Z took a 4 percent ownership in NBoA?

A.   I believe it was 2015.

Q.   And during these negotiations you were introduced to Mr. Redmond?

A.   Yes.

Q.   And how did it come about that you went to work for National Brokers of America?

A.   Just I started doing some part-time work for them. That's why I say I'm not sure on the dates because it's a little confusing. I just started working with them -- with Mr. Pack I worked with them.

Q.   When you started working part time, was that in 2015 or 2016?

A.   That I believe was toward the second half or possibly even the fourth quarter. It was later in 2015.

Q.   And what tasks were you performing at that time?

A.   Basically I was working with the computer systems, working with the implementation of various ERM customer

STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
21–24

Page 21

interfaces. They used one program. They were looking at installing another program. I basically was involved in that area mostly.

Q.  What was your experience with the computer interfaces?

A.  I've always just been good with computers, and I didn't have any formal schooling on that.

Q.  Were you helping design some kind of interface system?

A.  No. Design, no. Absolutely not. Just the existing system and putting it in for our company and helping it to work with the carriers that we dealt with.

Q.  What was the system called?

A.  Zoho, Z-O-H-O.

Q.  What sort of system is Zoho?

A.  It has various entities. It has various applications we used. The production monitoring and the -- basically production monitoring is what it is, the CRM system.

Q.  What is the CRM system?

A.  Customer resource management.

Page 22

We utilized that because it interfaced with what was called Zoho People which then would allow reports to go to the accounting firm.

Q.  So which employees would use Zoho?

A.  The CRM portion of it. Basically Mr. Barrera, Mr. Redmond. I can't -- basically I can't see more than that. I don't know.

Q.  So this -- the CRM portion of Zoho was not an interface that the employees on the telephones would use when they were selling their products?

A.  No, no. The -- no.

Q.  What -- I'm trying to understand what it did because I'm not getting that.

MR. RUSH: She's going to log out and leave real quick because she's frozen.

- - - -

(There was a recess in the proceedings from 10:11 a.m. to 10:14 a.m.)

- - - -

BY MS. BLUER:

Q.  Ms. Miller, if you can explain what

Page 23

this Zoho product was that you were helping install.

A.  It's a product that -- you have an insurance carrier, and you have the program here. They used a program prior to my coming here called Boomerang which I was not familiar with. I wasn't familiar with Zoho either. But what it did is it took the information -- when the company would sell an insurance policy on behalf of the carrier, it would basically interface with the carrier so the information was uploaded to them on a timely basis. There was a consultant who oversaw all this.

Q.  And you said that the Zoho CRM interfaced with Zoho People?

A.  Right. And what Zoho People was is just when people came they would sign in on their phones saying I'm here. Phones were not allowed on the floor at all. And then when they left for lunch or when they left for the day, they would sign out on Zoho People. So it

Page 24

was a time tracker.

Q.  And was that in place in 2015, or did you help implement Zoho People as well?

A.  I helped with that. And I don't think that really went in until 2016. But again, it -- sometimes it's hard to remember all the exact dates.

Q.  After your stint as a part-time employee assisting with the implementation of this software, how did your employment change at National Brokers of America?

A.  I think -- I believe it was March 2016. That is when I started working on a regular basis I believe.

Q.  What was your job title?

A.  I believe he called me a CFO.

Q.  So at some point you were the CFO. You're not sure if it was in March of 2016?

A.  Right. Because, again, I started working for him, and then along the way I just had that title.

Q.  Do you remember having any other titles before CFO?



Page 25

A.    No, not really.

Q.    What were your duties when you first began working full time for National Brokers of America in 2016?

A.    Basically the same as what I had been doing, working with the computer system, working with -- contracting with insurance carriers when a new product would come on.  It's a very complicated and long process.  So every time there's an insurance carrier or a product, there's a long amount of contracting that must be done for that.  So basically contracting.

Q.    Did you have any other duties when you first started with National Brokers of America?

A.    Basically whatever Mr. Redmond needed.  You know, if he said I need you to work on a spreadsheet for this or if I need you to do an analysis of that.  So basically whatever project he was on at the time with whatever supplemental help he needed.

Q.    Did you work with the payroll?

Page 26

A.    No.

Q.    Did you have anything to do with budgeting for the payroll?

A.    No.

Q.    Did you provide any information to the accountants for National Brokers of America with regard to hours worked or time sheets or anything like that?

A.    No.

Q.    Do you recall who was responsible for payroll at National Brokers of America?

A.    Not really.  There were a number of different people that tracked the payroll.  One of the ladies got severely ill, and then other people were jumping in trying to help.

Q.    What was the name of the lady who became ill?

A.    Jamie Crane.

Q.    How do you spell her last name?

A.    C-R-A-N-E.

Q.    And what was her job title?

A.    I do not know.  Probably administrative assistant.

Q.    And what was her role with the payroll?

Page 27

A.    I believe -- I believe she would submit it to the accountants.  She would submit the hours to the accountants.

Q.    And do you remember when she became ill?

A.    Yes, I do.  It was January of 2017.  And I don't want to discuss someone else's health, but she was out for 6 months, and then it was determined she was not going to be able to come back.

Q.    And so for 2016 she would have been the one submitting the time records to the accountants?

A.    I do believe so, to the best of my knowledge.

Q.    And do you recall the names of some of those people who were stepping in when she went out sick?

A.    I really don't.  People have come and gone and come and gone.  There was a high turnover rate.

Q.    You don't remember any of the names?

A.    I remember the names, but I'm not sure what their function was.  I'm not sure

Page 28

if they did payroll or not.  That's why --

Q.    Tell me the names of the people who you think might have done payroll?

A.    I think Michelle Klinger.

Q.    Is that with a K or a C?

A.    K.

Q.    And what was her job at National Brokers of America?

A.    I think she worked in -- well, she managed some departments at times.  The -- the functions changed frequently, very frequently, okay, which is why it's difficult to say who was to do what and when.  Because sometimes a person would be maybe running customer service.  Sometimes they might be working in HR.  Sometimes -- so that is why it makes it difficult.

The other person that I think would have been working on it would have been Ornella Sciumbata.

Q.    Do you happen to know how to spell that?

Page 29

A.    O-R-N-E-L-L-A and her last name would be S-C-U-I-M-B-A-T-A (sic).

Q.    And is there anybody else?

A.    I don't think so.

Q.    Did those two individuals move over to work for Bene Market when it opened?

A.    I do not know. I don't know the timing of when they worked. I think Ornella worked for both companies. I'm not sure about Michelle.

Q.    Do either of them work for Bene Market now?

A.    No, not for many years.

Q.    What kind of business is National Brokers of America?

A.    Well, National Brokers of America hasn't existed for a number of years.

Q.    When it was operating, what sort of a business was National Brokers of America?

A.    Basically an insurance brokerage -- broker.

Q.    And what does an insurance broker business do?

A.    Just sells insurance on behalf of an

Page 30

insurance carrier. They don't collect any of the fees. But they -- the carrier tells them here is what you're going to sell and here is the pricing. So basically it's a marketing agency.

Q.    And how did National Brokers of America know who to sell the products to?

A.    Basically when -- they would purchase leads from a leads company.

Q.    Do you recall what insurance carriers National Brokers of America worked with?

A.    I think the main -- the main one that they worked with when I was involved was a company called Health Insurance Innovations.

Q.    Any others that you can remember?

A.    When I -- I know that they had worked with -- what was it? United Healthcare. But that had stopped right at the time I was coming there. And they moved over to Health Insurance Innovations.

Q.    Where were they purchasing the leads from?

Page 31

A.    I cannot tell you that because I don't recall. But it's -- you know, there's various lead companies that sell them. I'd be guessing.

Q.    Do you know how it was that National Brokers of America generated income from selling these policies?

A.    They were paid commissions from the insurance companies.

Q.    And was that per policy?

A.    Yes. It was -- it was based on the policy sold they were given a commission.

Q.    Describe to me the hierarchy structure at National Brokers of America.

A.    Well, there was obviously Mr. Redmond, and then basically all the department heads reported to him.

Q.    And what was Mr. Redmond's title?

A.    Owner.

Q.    And how many departments were there?

A.    Hang on. Probably 6 or 7.

Q.    And do you remember what those departments were?

A.    There was customer service. There was

Page 32

a sales department, billing, verification, and then human resources. And then we didn't really have an accounting department because that was all done at the CPA firm.

Q.    I'm sorry? Say that again.

A.    We didn't really have an accounting department because that was done at the CPA firm.

Q.    At the CPA firm. And which CPA firm was doing the accounting?

A.    C. Malcolm Smith & Company.

Q.    And do you know if C. Malcolm Smith & Company were doing the payroll for National Brokers of America?

A.    Yes.

Q.    Do you recall who the department heads were?

A.    No. It changed too often. It changed too often. Ornella was in this department or that department. And Michelle was in this department or that department. And Jamie when she was there was -- you know, it just -- basically as needed. You know, you



Page 33

filled in where you needed. I did not do that. I was not on the floor.

Q. So if you can't recall which person headed which departments at which time, can you tell me who these heads were?

A. Well, Joshua Wespendorp.

MR. RUSH: Spell that.

THE WITNESS: I think I can spell it. W-E-S-P-E-N-D-O-R-P.

BY MS. BLUER:

Q. Joshua Wespendorp.

A. And then there was Jamie -- another Jamie. What was her last name? It will come to me in a few minutes. You're really testing my memory.

MR. RUSH: Bridenstine.

THE WITNESS: Bridenstine, B-R-I-D-E-N-S-T-I-N-E.

BY MS. BLUER:

Q. Bridenstine. And then there was Ornella?

A. Yeah. Not -- not exactly at the same time.

Q. What was Ornella's last name again?

A. Excuse me?

Page 34

Q. What was Ornella's last name?

A. Sciumbata.

Q. I think you already spelled that, but if you could spell it again.

A. S-C-U-I-M-B-A-T-T-A (sic).

Q. And what was Michelle's last name?

A. Klinger with a K. There was Dalia Borges. Like I said, it changed tremendously. That is D-A-L-I-A B-O-R-G-E-S. I'm just trying to remember. Bradley Butler. I can't even remember that far back. It seems like there was someone else.

Q. Did you say Barbara Rack?

A. The last name was Bradley Butler.

Q. I thought you said I can remember Barbara Rack, but perhaps that's not what you said.

A. I said I'm having trouble remembering who was in the -- heading the sales department because again it changed frequently.

Q. Oh, maybe you said that far back. I thought you said Barbara Rack.

Page 35

A. No. That's what I remember for the time being.

Q. And were their department heads managers?

A. I'm unsure. I believe so.

Q. Did they supervise any of the workers?

A. Their department, yes.

Q. Do you know if they were hourly or salaried employees?

A. I believe they were salary.

Q. And what do you base that belief on?

A. Just to the best of my knowledge. They were paid, you know, a flat amount.

Q. And how do you know that?

A. Probably by the title I would assume that.

Q. I'm sorry. Say that again?

A. I said I guess by their titles is why I would assume that.

Q. So you don't know that from looking at any records?

A. Yeah, I'm sure I probably saw that in some payroll records at one point in time or another.

Page 36

Q. And what part of your job caused you to be involved with the payroll records?

A. For a while -- for a while I helped Mr. Redmond and Mr. Butler on developing key performance indicators. Or basically he developed them for all employees. So because of that, you know, I would have some interface with that at times. It wasn't really directly with payroll in producing it. It was more in assigning what the KPIs were going to be for the different people based on what, you know, Mr. Redmond instructed.

Q. When you were helping Mr. Redmond with the KPI, did you help develop the compensation scheme that they were using to pay employees?

A. No. I didn't develop it, no.

Q. Did you help put in place policies for how employees would be paid?

A. No.

Q. So what was your involvement in that process?

A. Basically what -- it was more on a



Page 37

performance, on computer reports, on -- you know, like the number of policies sold or monthly premium, that type of thing where it would be -- you might say -- these are not good examples. But the sales department would be responsible for a monthly premium. And if they got to this level, they would get a bonus of so much. And if they got to this level, they would get a bonus of so much and, you know, that type of thing based on whatever the KPI was for the individuals. So it was basically taking the base compensation and then incentivizing them by commissions.

Q. So with the example that you were using for the sales department, are you saying that if employees sold X number of policies they would be eligible for a sales commission?

A. I don't know if it was number of policies. I'm not really sure -- it would be whatever KPI was determined for that. But if they achieved certain

Page 38

goals, they would be eligible for commissions.

Q. What do you mean by base compensation?

A. Just basically a person was hired for, you know, a week's work. You're paid $1,200. So then in addition to this, you could earn commission for certain departments, not all departments.

Q. So which departments earned the flat base rate?

A. I think that would have been customer service. Although, you know, there were some KPIs where they could have gotten additional. Basically the way it was determined was if they are paid overtime then you're not -- you can't get the commission. If you're salaried and you have a base compensation, then you could earn additional commissions.

Q. Which positions were salaried that could earn a commission and which ones could earn overtime?

A. I can't tell you that much detail. I don't recall. I can give you generalizations.

Page 39

Q. That's fine. Just tell me what you remember.

A. Just the sales department. Basically it's a cause and effect. If what you do is sales and it increases the revenues of the company, then you will be rewarded with being able to get a commission. Generally speaking, certain departments were -- are a little more difficult to do that with. For instance, customer service. So I know that -- I don't believe NBoA incentivized customer service or the verification department. But I believe Bene Market did it differently.

Q. So at National Brokers of America, customer service representatives weren't eligible for bonuses, and the verification specialists weren't eligible for bonuses?

A. To the best of my knowledge.

Q. Did they still have KPIs?

A. I'm not sure.

Q. What employees worked in the sales department?

Page 40

A. I cannot give you a complete list because I don't recall.

Q. Were they the licensed agents or some other category of worker?

A. Category of workers. License agents were in the sales department, but there were other positions.

Q. What were the other positions?

A. Basically qualifying specialists, which is a person that would have the initial contact with the potential customer and determine whether they were eligible for the product that we were selling at that point in time. And if they were, then they would forward the call on over to a licensed agent. That way you're not taking up the sales agent's time with people that are not qualified for a product based on, you know, what the carriers specified as the qualifications.

Q. So the qualifying specialist would they be making calls out, or would the calls come in?

A. All calls were coming in. We don't



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 41

make calls out.

Q. So somebody calls in. The call goes to the qualifying specialist. If the person qualifies, they go to the licensed agent. After the licensed agent does their part, does the call go to anybody else?

A. To the verification representative.

Q. I see. So the employees that -- the licensed agents and the qualifying specialists were paid a flat salary and were eligible for bonuses based upon the number of sales they made; is that correct?

A. Based on whatever the criteria was, whether it was sales, whether it was a monthly premium. In the insurance industry, a lot is measured by monthly premium.

Q. And did Bene Market use the same pay structure?

A. I believe so. I believe so.
I do want to correct one thing just for the record.

Q. That's fine.

Page 42

A. The lead company -- the lead company -- the way it works is the lead company would -- we didn't call out and they didn't call in. The lead company would identify a lead, and it would go into their dialer system. And when it connected, it would connect to us.

Q. I see.

A. So that's -- we did not do any calls out. But they didn't really -- it was through the lead company which is TCPA compliant.

Q. The Telephone Consumer Protection Act?

A. Yes, ma'am.

Q. I believe you said that the customer service representatives and the verification specialists they were eligible to earn overtime; is that right?

A. I believe so to the best of my knowledge. I'm not -- again, I did not produce payroll so I can't give you a -- you know, a firm -- but to the best of my knowledge.

Q. And that's from your involvement in

Page 43

developing the key performance indicators?

A. Yes.

Q. Tell me what you mean by key performance indicator.

A. A key performance indicator connects an employee's productivity to their output, whatever their output is. It's a lot easier in a manufacturing company that makes widgets, how many widgets did you make in the hour. So that's a little bit easier to conceive mentally.
But basically it was just tying the output of the employee to the requirements and the productivity level so that -- you know, to get better, to improve, you know, streamline.

Q. Is it accurate to say that you helped Mr. Redmond decide which incentive structure should apply to these various positions?

A. No. He decided what the incentive structure was. And then I would put it into writing and put it on paper and make the mechanics of it work from an

Page 44

accounting point of view, from a logic.

Q. So you were memorializing it and putting it into the computer?

A. Yeah, yeah.

Q. Did you have any decision making role in the setting of the KPIs for the different groups of employees?

A. No.

Q. When Mr. Redmond developed these KPIs for the various positions, did they change over time, or did they remain the same?

A. Oh, no. They changed frequently.

Q. Did they change per employee, or did they change for a class of employees?

A. For a class of employee. By employee function.

Q. Can you give me an example of a KPI that was developed and then how it changed over time?

A. Well, what would make it change is, for instance, if you changed insurance carriers that you're dealing with. That's going to change what the company receives, what the -- you know,



Page 45

structure. So that would change the numbers you have to adjust. You might -- as with anything, you might with one insurance company receive a 10 percent commission and with another one you might have a 15 percent commission. So that could reflect -- you know, it's based on the insurance carrier you were dealing with, the product lists that were being sold.

Q.    So is it accurate to say that when the amount of income that could be made from a product changed Mr. Redmond might change the KPIs or change the incentives for the employees in response to that change?

A.    I believe so.

Q.    You had mentioned that when Bene Market was opened that Mr. Redmond had changed the KPI incentive structure for the customer service and the verification specialists. Can you explain that change?

A.    At some point in time -- I cannot tell you exactly when it happened. But the

Page 46

philosophy of the company, which is the whole reason I became licensed, was that we -- our preference was anybody in the company we preferred to have everybody as licensed agents, okay, to do the best quality work we could for our customers. So as -- we had ended up with many licensed agents in customer service. So at that point in time if somebody called in, number one, they could service them. Number two, they could offer them additional products. So then at that point in time customer service could be incentivized based on being licensed agents.

Q.    What was the purpose of customer service, the customer service department?

A.    Just to help people, you know, when they're having a problem. Most insurance companies have their own customer service department themselves. So many insurance companies have the customers call into them. Some

Page 47

insurance companies would have them call into us, and then we would load the stuff onto their computer system. So it would be -- you know, to problem solve. I changed my credit card number, you know, or whatever and it would be put on to the insurance carrier, their system. We did not maintain that here. It was on their system.

Does that make sense?

Q.    It does.

So at Bene Market when you started adding licensed agents to the customer service positions, how did the KPIs change to allow them this incentive pay structure?

A.    I believe it was based on number of calls that they took and if they were able to sell additional products to the customer.

Q.    So were the customer service representatives for Bene Market paid a flat salary and then could earn a bonus based upon their sales?

Page 48

A.    I'm unsure. I believe so to the best of my knowledge, but I -- I could not tell you that for sure.

Q.    And that's based upon your involvement in the KPI process?

A.    Yes.

Q.    So were you involved in developing a KPI for customer service representatives at Bene Market that involved bonuses for answering calls?

A.    I believe that was one.

Q.    And would you call that a bonus, or would you call it something else?

A.    An incentive or a bonus, yes. Incentive I believe was the word.

Q.    And was the same incentive available to all the employees in the department?

A.    No. Just the licensed agents.

Q.    Just the licensed agents?

A.    A nonlicensed person could not sell insurance.

Q.    Would the same incentive structure be available to all the licensed agents in the customer service department?

A.    To the best of my knowledge, yes.



Page 49

Q.    And how were the employees notified about these incentive programs?

A.    Through company meetings, department meetings. Maybe their manager -- department managers might have presented something.

Q.    How frequently did the KPIs change for the customer service representatives?

A.    I can't tell you. I don't know. I don't recall.

Q.    Would it be more than once a year?

A.    Oh, most probably. In the insurance industry, again, this is a constantly fluctuating environment. And any time that again there's a change of an insurance carrier, there's a change of products, you know, this insurance carrier adds a couple more products to our portfolio. It's a constantly evolving system. It changes constantly.

Q.    What was the incentive structure that was put in place at Bene Market for the qualification representatives?

A.    I believe that was based on the number

Page 50

of leads as the calls came in, the number of leads that they handled, and the number of transfers they made over to the sales agents to complete a sale. And I believe that it was based on completed sales, not on just the transfers.

Q.    And would the qualification representative receive a base pay and then a bonus if they handled the required number of leads?

A.    Yes. If they -- whatever the KPI was. You know, if they exceeded whatever the KPI was on that day or month.

Q.    Did the employees have the same base pays?

A.    Depending on the department basically.

Q.    So the qualification representatives would have a base pay, and that could be different for the base pay for the customer service representatives?

A.    I do believe so.

Q.    Do you know if at Bene Market if there were any category of worker after the incentive programs were put in that

Page 51

were still eligible for overtime pay, or did everybody move to the base pay and bonus system?

A.    Oh, no. If -- I'm not exactly sure of timing. But basically there -- people that were not able to benefit from the incentive they all got overtime. I believe verification was usually a base salary for so many hours a week and then overtime.

Q.    And for the employees that got overtime first at National Brokers of America and then at Bene Market, do you know what the overtime rate was?

A.    It would be 1.5 of their hourly rate. So basically what you would have to do is say -- I'll try to give an example here.

The pay is -- would be about -- if you were paid $1,500 every two weeks -- let's give this as an example. You worked 10 days. So you were getting $150 a day. And that would represent a decided amount of hours. So if the person worked

Page 52

overtime, what you would do is you would take $1,500 divided by 10 divided by their daily number of hours, and that would give you their hourly rate. And then they're paid 1.5 percent of the hourly rate. That's just a standard calculation.

Q.    Was the overtime applied to hours -- let me rephrase that.

Explain to me which hours would qualify for overtime pay?

A.    There was a differential put into the payroll for the number of hours worked a day. For instance, one person might work 9 to 5, and one person might work 9 to 6. Now I'm just -- I'm not getting into lunches and all that kind of stuff. I'm just trying to give a basic example.

9 to 5 is 8 hours. Okay. So anything over 8 hours they will be paid time and a half. The person working 9 to 6 that's 9 hours. Okay. So they would have a higher rate because the rate would be decided upon because of

Page 53

8 hours plus 1.5 hours, 1.5, equals 9.5 hours. So right there is where your overtime is calculated in there. And then that is where their base pay would come from.

Q.    I see.

A.    If somebody worked 10 hours a day, it would be the same thing. It would be 8 hours plus 3 hours. Because 1.5 percent of 2 hours, okay, equals 11 hours. So then their base pay would be 11 times their hourly rate. So it was built into the payroll to the best of my knowledge.

Q.    And this is -- is this a spreadsheet that you're talking about?

A.    I don't know exactly how Malcolm Smith had done it, but that was the calculation. They did the actual payroll.

Q.    And so overtime was paid on a daily basis and not a weekly basis?

A.    No. I was just using that as an example. It would be paid on a weekly basis. But their base pay would be --

Page 54

if you worked 10 hours every day and your base pay includes 10 hours every day, then when you exceeded 50 hours you would get additional overtime. Because when you work 50 hours, 40 of the hours plus 10 hours of overtime was already calculated in there.

If a person worked less, they just benefited and got the overtime. So if I'm getting paid for 10 hours a day, all right -- I get paid for 10 hours a day, and I end up working 4 days and 1 extra day of -- so I end up working 49 hours instead of 50 hours. I still was paid for the 50 hours. It was built into the system. So people were automatically getting paid for overtime.

Q.    Workers were automatically paid 10 hours every day regardless of the number of hours they worked?

A.    If their position was a 10-hour day job, they worked 10 hours a day. They were paid for the 10 hours a day. If they worked 10 hours a day, they were

Page 55

actually being paid for 11 hours a day.

Q.    So if somebody's schedule was to work 10 hours a day 5 days a week, their base pay would be straight time for 80 hours and then 2 hours of overtime?

A.    I apologize. You cut out so I didn't get the full --

Q.    So I'm just struggling to -- I'm struggling to understand the base pay and hourly workers in conjunction with one another, especially with this automatic built in overtime you're talking about. So if you could just run through that with me one more time. I thought I was with you until we started talking about 10 hours a day and then --

A.    I'm sorry. It is a complicated system. Okay. It is a complicated system. Your traditional job is 8 hours a day. However, in the call center your hours -- you may work 10 hours a day or 11 hours a day depending on the position.

So when a person was hired,

Page 56

what their anticipated hours were were all taken into account with the overtime factor to get them to base pay when they were hired. If somebody was hired for 10 hours a day and then they moved to a department that worked 8 hours a day, then their base pay would have to change, okay, because they are no longer working 10 hours a day. But if somebody just missed a day, we're not going to change their base pay for one day missed. Okay. Does that make sense?

Q.    It does. So were employees on fixed schedules?

A.    Basically I think everyone was.

Q.    Everyone has a fixed schedule. And when they start work, is it true that they negotiated what their expected hours would be?

A.    No. They were told what their expected hours would be.

Q.    Told what their expected hours would be.

A.    It was here is the base pay. Here is



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
57–60

**Page 57**

what your hours are, you know. It was explained to them in detail when they were hired.

Q. So if somebody needed to take some time off, would that just be deducted from their pay?

A. If it was -- unless it was paid time off. If they had any vacation or personal time, they could take that.

Q. So if I'm a new worker and I don't have any paid time off and I need to take Tuesday afternoon off, 4 hours for a dentist appointment, how does that affect my pay?

A. You would -- I believe they would deduct 4 hours to the best of my knowledge.

Q. What if I'm scheduled to work 10 hours a day 5 days a week and one of my calls goes long and I'm stuck on the phone for an extra 15 minutes one day, how is that accounted for?

A. You leave 15 minutes early the next day or come in 15 minutes late the next day.

**Page 58**

Q. What if I just come in at the normal time?

A. I do not know. I do not know. I was not in -- doing the actual payroll so I can't answer that.

Q. But you were a 4 percent owner of the company?

A. Yes.

Q. And you were involved in establishing these KPIs?

A. Yes. And the way it was designed -- Mr. Redmond was always very supportive of his employees. He wanted them to be successful. He takes great pride in helping his employees to have an opportunity to be successful. So he -- you know, his view was I don't really care -- you know, he wasn't going to split hairs and say, okay, you were gone for 4 hours so that's, you know, 4 hours plus -- you know. To the best of my knowledge, he didn't split hairs.

Q. So the system that the accountant set up where you would put in the hours and the sales did that system just

**Page 59**

pre-populate with a fixed number of hours for each day for each person?

A. I don't know. I didn't put any hours in there so I don't know exactly the worksheet. I have seen their worksheet upon occasion, but I didn't look at it in that kind of detail.

Q. So how did you develop this understanding of the employees who have the 8 hours of regular time and 2 hours of overtime built into their pay?

A. In conversations with the CPA firm.

Q. And which individual in particular?

A. John Sardella.

Q. So John Sardella explained the pay system to you?

A. Yes.

Q. And what was the circumstance that led to him explaining the pay system to you?

A. You just have to understand it in order to develop KPIs.

Q. Did John Sardella participate in the development of the KPIs?

A. I don't believe so.

**Page 60**

Q. So would you and Mr. Redmond tell Mr. Sardella about the KPIs, and then he would come up with the system that you would need to input the hours and the sales into?

A. Well, they're two different things. The payroll was one thing. Bonuses were I believe calculated on a monthly basis. So on your payroll, that would have been based on your standard, your base hours, your base pay. The -- when you're talking about incentives for selling so much for the premium, that would be the monthly. And I believe that would come out on the 12th of each month, somewhere around there is when that was paid. Again, I defer to them because they have all that information.

Q. For the workers who couldn't get the incentive payments because their job function didn't allow for it, were all the people paid overtime as part of their base rate or only some of them?

A. If they were working in excess of 8 hours a day, it was calculated into



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
61–64

Page 61

their base pay. If they worked over whatever their -- you know, for instance, if they were to work 10 hours a day. If they worked 11 hours a day, they would be paid overtime for that additional hour. It would be an additional overtime. So you had your base overtime and then you had additional overtime.

Q. So the overtime was calculated on a daily basis rather than a weekly basis?

A. No. It's calculated on a weekly basis, but I just used that as an example. So instead of saying if they are working 10 hours a day, that would be 50 hours a week. So if they worked 55 hours for the week, then the extra 5 hours would be paid in time and a half.

Q. If I am working at Bene Market and I work 10 hours a day, I work 4 days that week and I take Friday off. Did I make overtime on Monday through Thursday?

A. Yeah. I do believe so to the best of my knowledge. Because the calculation would have been made on a daily basis,

Page 62

so you would have been paid 80 percent of your pay for that week. So yes, they would be paid 80 percent which calculates the overtime into it.

Q. So for an employee who is entitled to bonuses that has a contract to work just 80 hours a week, do they have any overtime built into their base pay?

A. Not if they're -- if they were working 40 hours a week or 80?

Q. Yes. I'm sorry. I'm sorry. I meant 40 hours a week.

A. Yes. If they worked in excess of that, yes, they would be paid time and a half.

Q. But if they just work their regular schedule of 80 hours, would their pay structure include any overtime?

A. No. Because that's -- the standard workweek in the United States it's 40 hours a week.

Q. I'm sorry. And I meant to say 40, not 80. I'm expecting that they get some overtime if --

A. If they work 80 hours a week, God bless

Page 63

them.

Q. So for an employee whose schedule is 8 hours a day 5 days a week, they do not have overtime built into their base pay?

A. Correct.

Q. If they work beyond what they're contracted to work or beyond what their negotiated schedule states, that's when they would be eligible for --

A. Correct.

Q. Is there anything in the employee files that memorializes the agreement for how many hours they would work and what their compensation structure would be?

A. I do not know.

Q. When you were working for Bene Market, were you an employee as well as an owner?

A. No. I just functioned as an employee.

Q. And did you get a salary?

A. I did.

Q. Did you have anything in your personnel file that memorialized your pay agreement?

Page 64

A. I do not know.

Q. Were you asked to sign any kind of offer sheet when you started with --

A. I'm not sure. I'm not sure if I signed an offer sheet or not. There were standard documents that were to be signed, nondisclosure agreements, HIPAA regulations, confidentiality agreements. But as to whether everybody had contract letters or not, I believe people did, but I do not know that.

Q. How did you come to be a 4 percent owner for Bene Market?

A. Mr. Redmond just actually offered it to me. When the companies changed -- I guess I'm a hard worker. And basically I lived in Gettysburg and I worked out here, which caused a lot of inconvenience. And when he -- he wanted me to stay with him. He said that I will -- I will offer you a 4 percent ownership.

Q. Do you get a percentage of the profits as well as your salary?




STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
65–68

Page 65

A.   Theoretically, yes.  I have never received any income as a result of being an owner of the company.

Q.   What is your salary at Bene Market?

A.   Excuse me?

Q.   What is your salary?

A.   I don't -- I retired a year ago, so I only work on occasion for Mr. Redmond.  For instance, just on March 31st he contracted me to come in one day a week.

Q.   And are you paid a flat fee, or are you paid hourly?

A.   I'm paid at an hourly rate.

Q.   What is your hourly rate?

A.   $135 an hour.

Q.   And what was your salary before you retired?

A.   I think it was the equivalent of about $75 an hour.  I don't really (witness pauses) --

Q.   Were you paid an hourly basis or a salary?

A.   It was on a salary basis.  I'm just trying to do apples to apples.

Page 66

MS. BLUER:  So I think this is a good time for a break.

- - - -

(There was a recess in the proceedings from 11:21 a.m. to 12:14 p.m.)

- - - -

BY MS. BLUER:

Q.   Thinking back to your time at National Brokers of America, do you recall there being an investigation conducted by the wage and hour division?

A.   There was but it was like really before I was there.  I think it was just basically finishing up around my appearance.  I don't know if I was part time at the time or -- but yes, there was one.  And I believe the gentleman's name was Steve Fedock, F-E-D-O-C-K.

Q.   The investigator who you interacted with?

A.   I only had one interaction with him.  Because like I said, this was at the end of it.  But I believe it was -- it was -- I'm pretty sure it was like I think a federal representative.  I

Page 67

think that was -- as opposed to state.

Q.   Right.  We're the federal U.S. Department of Labor.

A.   Okay.

Q.   An investigator for the U.S. Department of Labor Wage and Hour Division.

A.   Okay.  And he was out of Reading.

Q.   And tell me what you recall about your interaction with Mr. Fedock, Investigator Fedock.

A.   I just met him once.  I think I took something into him or -- I just remember seeing his office.
     Basically what he said is -- I never heard it quite said like this before.  But he said we have a fluctuating base payroll.  And what he said is he explained to me that the payroll was like -- kind of like a restaurant.  But he said this is a whole different animal.  And that it -- with a restaurant, you know, a waitress might get a median hourly pay and then they get tips on top of that.  And the restaurant has to make sure that they

Page 68

don't get paid less than minimum wage.
     And like I said, it was -- I believe the words he used was fluctuating biweekly pay.  So that was my first exposure to him at all.

Q.   Did Mr. Fedock tell you that National Brokers of America were paying their workers less than minimum wage?

A.   No.

Q.   Did he tell you that they were violating overtime rules?

A.   There was -- I don't know that he ever said that to me.  But I know that there was an agreement made, and there were a number of employees that were paid some additional wages for employees during the said period of time that they felt needed additional wages.
     And at that point in time I think that's -- that's what was discussed with the CPA firm and, you know, implementing a better payroll system, which was, you know, that takes into can account the pay -- the time period we ask employees to work.

Page 69

My connection is unstable. Sorry. Something happened to my connection there for a second.

Q. So you said you put into place a pay system that took into account the hours that employees worked; is that correct?

A. Right. Which is what I was describing to you earlier.

Q. So before the wage and hour investigation -- before the first wage and hour investigation that concluded in 2016, National Brokers of America were not paying employees based upon the hours that they worked?

A. I do not know that. I cannot -- I cannot say that. I don't know enough about it. As I said, I wasn't involved in payroll. And I met Mr. Fedock the one time.

Q. Isn't it true that you participated in the final conference on behalf of National Brokers of America with Mr. Fedock?

A. That would probably be the one time I met him. That would probably be

Page 70

exactly what I'm referring to.

Q. So you were representing the company, and he was giving you information about the way that pay practices violated the Fair Labor Standards Act?

A. I'm not sure of his exact words.

Q. What was your purpose in that meeting? Why were you there?

A. He had put together a listing of additional pay he felt people were entitled to, and I saw to it that they got paid. You know, he gave me the listing, and then I made sure that it was paid. There were releases signed by everybody as they got paid it.

Q. Why were you chosen to represent the company at the meeting?

A. Because I assume Mr. Redmond felt that he -- he could depend on me. I have a better understanding of some things than some people.

Q. But you said you didn't have anything to do with payroll?

A. No. But I did whatever -- whatever he needed help with at the time I would

Page 71

help him with. I believe that the whole -- that the whole investigation was handled to the best of my knowledge by C. Malcolm Smith & Company. So at that point in time it was just a matter of getting in the results and implementing what he instructed us to implement.

It's not really that I was representing the payroll. I was more representing the company and getting his results and seeing to it that they were implemented properly.

Q. And so did Mr. Fedock explain to you how National Brokers of America's pay practices would need to change in order to comply with the Fair Labor Standards Act?

A. I really cannot recall. I really can't. I don't recall all the details of the meeting. I just recall the -- this needs to be paid to these people. You need to get this signed off on. I remember him saying that he viewed it as a fluctuating biweekly pay system,

Page 72

and he wanted to make sure people were paid fairly.

Q. Were you the CFO for NBoA at the time?

A. I think that might have been the title. Again, I was more into the production -- the performance management and working on those systems at that point in time. I wasn't doing really payroll or traditional CFO functions.

Q. Did any of the accountants participate with you in the final conference?

A. I do not recall.

Q. Did Mr. Redmond give you any instructions before you went to represent the company in that meeting?

A. Not that I recall.

Q. Did you discuss what took place in that meeting with Mr. Redmond after it occurred?

A. Yes.

Q. And what did you tell Mr. Redmond?

A. Basically just what I told you. That he felt we needed to do a better system, which we worked on doing a

Page 73

better system, and making sure that these people were paid and that we had sign offs.

Q.    And did you participate in developing the better payroll system?

A.    You know, basically what I did is explain it and develop it as I expressed to you earlier. And then I gave it to the CPA firm, and they went and did their thing.

Q.    So you came up with the system and then you conveyed it to C. Malcolm Smith & Company and they implemented it?

A.    I don't know who did, if I came it up with it. I don't know if we came up with it jointly. That was quite a ways back. But basically, again, I do know that we told -- we told them and everybody agreed that we did not want people working overtime without being properly compensated for it. So that was -- their function was to make sure things were done correctly.

Q.    When you say you don't know if you came up with the pay system or we came up

Page 74

with it, who do you mean by we?

A.    Mr. Sardella and myself or -- you know, I'm not -- my memory is not what it used to be.

Q.    And did Mr. Redmond participate in developing this new pay system as well?

A.    I don't really believe so. He would have had to have blessed it.

Q.    So you came up with the system -- possibly -- the pay system possibly with Mr. Sardella in part, and then you presented it to Mr. Redmond by his okay before it was implemented?

A.    I don't know. I don't recall that far. I don't recall the actual logistics of it happening.

Q.    Tell me the parts that you do remember.

A.    Just that we needed to do it properly and I wanted to assure that it was done properly. And that if people -- people need paid and we need to comply with wage and hourly, you know, as simple as that.

Q.    Do you recall getting Mr. Redmond to agree to this new pay practice before

Page 75

you presented it to the accountant?

A.    I don't recall the exact sequence of events. It would not have gone through without his blessing.

Q.    Do you recall how you came up with the system of paying people for 8 hours of regular time and 2 hours of overtime a day?

A.    It was basically Mr. Redmond said I want to hire people at this much per week or this much biweekly. You figure out how to put it together. So what I did was I said, okay, this is what it translates into, and this is how it is calculated.

So he'd said okay, I want to hire this position. I want them to work this many hours and pay them this. So then by providing me those for factors, I can sit down and say, okay, then this is what it is equivalent to. This is what your hourly rate is. This is what your overtime rate is. This is -- you know, and this is what it is.

Q.    Mr. Redmond would say I want this

Page 76

number of people to be paid X amount per pay period, and then it was your job to figure out what that would be on an hourly basis?

A.    Oh, no, no, no, no. When they were hired, they were hired at a -- it was by position. So this position might be hired at 1,500. This position might be hired at 1,200, you know. They were paid basically -- they were paid the same all the time. I'm not sure I understand the question.

Q.    I'm trying to figure out how you determined an hourly rate if the pay structure was to pay them a flat rate.

A.    The way you would determine the hourly rate would be to take -- take the rate you were going to pay, take how many hours that would account for, take into account what the overtime hours attributable to that employee would be. And then from there you would determine what their hourly rate was.

There was no worksheet that said Stephanie Miller is paid $13 an

STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
77–80

Page 77

hour. Bill Rush is paid $15 an hour. There was no worksheet like that. Okay. Basically people were hired. Stephanie was hired at $1,500 an hour. Stephanie was hired at -- I'm sorry about that. Stephanie was hired at $1,500 biweekly, and she works this many hours. Bill was hired at 2,000 biweekly, and here's what his hours are. And then that was all handled with Malcolm Smith & Company.

Q. When you say that was all handled by Malcolm Smith & Company, what do you mean?

A. They would conduct a payroll based on that information. Someone -- at first it was probably Jamie Crane. It certainly would have been Jamie Crane way back then. And then basically they would have run reports off for several people because that would have given them the information.

So basically they would drop the -- you know, it was more an -- I believe, I believe -- because I didn't

Page 78

do it. But I believe it was more an exception that here is your payroll. Here is your people. Is there anybody that missed time, okay, is more the way that was done or is there any overtime. So you know, basically you had your base pay for this period. Okay. Are there any adjustments to that for missed time or for overtime.

Q. When you say you believe that this is the case because you didn't do it, what is that belief based on? Where did you get that information?

A. In conversations with Mr. Redmond, in conversations with Mr. Sardella.

Q. Did you ever review any payroll documents for National Brokers of America?

A. Not offhand that I recall.

Q. Were you ever involved in transmitting the reports to the accountants so that they could prepare the payroll?

A. No. To my -- to the best of my understanding, those would come directly from Mr. Redmond. I think

Page 79

they were submitted to him, and then he would send them over.

Q. Do you know what documents were sent to the accountants for them to prepare payroll?

A. No, no.

Q. What were the reports that you were talking about?

A. Which one?

Q. You just mentioned that Jamie Crane would run reports and that they go to the accountant?

A. I don't know exactly what reports. At that point in time, I don't even know if they had a, you know, punch clock. I know once Zoho was implemented that the report would come off of Zoho People. So at some point in time they stopped using them.

Q. So for National Brokers of America, they originally had a time clock where people would punch in and out?

A. I don't know for sure. I know I saw a time clock. I don't know if people actually used punch cards or not. I

Page 80

worked in a different section of that building that's in a different building than we are in now. And I worked in a different section. I have never been out on the floor, which is where that would be. And like I said, Jamie Crane took care of that.

So because I saw a punch clock, I'm kind of assuming that that's what they were doing. But again, that was really before my, you know, involvement.

Q. When you helped implement Zoho People where the employees would use their cell phones to clock in and out, it's your understanding that that information was sent to the accountants for them to process the payroll?

A. A report. It just said, you know, Stephanie missed a day this pay period. Jamie missed two days this pay period, that type of thing.

Q. So it wouldn't give a clock in and a clock out time?

A. It did. But that was -- well, I don't

Page 81

know. I could be wrong on that. Maybe they -- they might have sent that to them. Maybe they did send that to them. I don't know. I know it existed so they probably did.

Q. How was the data from Zoho People maintained?

A. I'm trying to think if it was on a personal computer or -- I'm not sure. I'm unsure. IT, Brad Butler, could probably answer that. I do not recall.

Q. As the CFO did you ever need to go into Zoho People to pull data for any of your job functions?

A. No, not really. If I did, I would have had somebody do it for me. The only way I would have needed it was when I was developing KPIs, you know, maybe. But that was more based on again Mr. Redmond saying here is what we want to pay. Here is, you know, your KPI. Here's where we want the parameters to be. So I don't know that I would have even needed it for that.

Q. So who would be able to tell me from

Page 82

National Brokers of America what information was being sent from Zoho People to the accountants?

A. I would say the accountant.

Q. Is there anybody in the company who would know?

A. I don't think anybody is here anymore. And I don't have access to Zoho People anymore.

Q. What happened to Zoho People?

A. In -- in 2017 as I told you before Ms. Jamie Crane became very sick. And after 6 months we determined she wasn't going to be able to come back. In June of 2017 I became seriously ill, and I was out for 3 months. I had to have emergency surgery for a life-threatening situation. And then in January of 2018 I had to be out again for 3 months.

So there's periods of time in there that I wasn't even there. And I was not doing traditional functions so -- I'm not being evasive. I don't know some of the answers.

Page 83

Q. When did the company stop using Zoho People?

A. While I was out.

Q. Which time?

A. The first time, yes. Because when I came back, they were signing in on sign-in sheets.

Q. So they went from an automated system to a paper system?

A. Yep.

Q. Why was that?

A. I have no idea. I wasn't there. I wasn't involved in it. I could not understand that. It may have been that there was a lack of people that understood Zoho People once I left and was out. So maybe that was it, but that is pure speculation.

Q. How did the sign-in sheets work?

A. I don't really know. I had nothing to do with it. I just know that it was out on the floor. There was a sign-in sheet, and somebody was taking care of it.

Again, I physically -- the

Page 84

whole floor, the sales area was one big area, and I worked in another area. I wasn't out on the floor. I wasn't in that area very often.

Q. Was there a sign-out sheet?

A. I'm sure it was all the same sheet.

Q. But you don't know?

A. I do not know.

Q. Who maintained those sheets?

A. I believe at that point in time it was a lady named the Sara Adams.

Did she freeze on me?

Okay. There you are. You're back.

Q. It was me that time I think.

Who maintained those sheets?

A. Sara Adams.

Q. What was her job title?

A. I don't know what her title was.

MR. RUSH: Her name has changed since.

THE WITNESS: Yeah, her name has changed since. It's Frye now. Sara Frye.

BY MS. BLUER:



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
85–88

Page 85

Q.    What department did she work in?

A.    She just -- she worked very similar to me with working very close to Mr. Redmond. And she was a licensed sales agent so she was out on the floor. As I was not on the floor, she was more of the counterpart on the floor.

Q.    So she kept those sign-in sheets?

A.    I assume she kept them. I don't know what she did with them. But yes, they were under her jurisdiction.

Q.    And was the company still National Brokers of America at that time?

A.    The company -- I couldn't tell you. I could not tell you exactly when. I believe at that point in time it had -- that Bene Market was doing the contracting at that point in time. Because National Brokers had issues with contracts due to one carrier that we were dealing with that had problems. And that was why Bene Market was formed and developed to be able to do contracts with new carriers and work

Page 86

with new --

Q.    What was the problem with the carrier?

A.    The department of insurance was doing an investigation for Health Insurance Innovators. And at that point in time, we had an exclusive contract with them. So that caused a lot of issues for us. Although there was never any findings or anything like that. It just kind of, you know, froze us.

So because of that we needed to -- you know, Bene Market was formed, and it was able to go out and contract with new carriers while the whole HII issue was being dealt with. We just didn't have anything to do with it.

Q.    When Bene Market was formed, what position did you have with that company?

A.    I just -- I guess I was probably CFO again. It just -- again, at that point in time, I was doing contracting. I was also assisting with licensing because that was a major function of -- a prior function of Jamie Crane who did

Page 87

not come back. So I was trying to help fill that role while we were trying to identify someone to do that. So again, I do more of what's needed at the time.

Q.    Were you still working with the KPIs?

A.    No. I think -- I think that was about done. I think that the KPIs were used for a period of time. They are still used but they're -- I don't really know. That's maintained on the computer system. And I would say Jesus Barrera and Arthur Walsh would -- and Mr. Redmond of course would be far more knowledgeable at this point on any of that. My involvement with the KPIs was done.

Q.    Your development with the KPIs was done before Bene Market was formed?

A.    No. I believe I worked with it on Bene Market at the very beginning. But once we had the more robust computer system, I did not need to do that. I think it was -- I believe it was all done in the system.

Q.    As the CFO were you consulted about the

Page 88

KPIs so that the cost of those incentives could be taken into account for the running of the company?

A.    No. No, not really. There was not any budgeting put into effect at that point in time. There's still not. So that was -- that was Mr. Redmond and Mr. Walsh and Mr. Barrera's baby, their call.

Q.    There's no budgeting for payroll?

A.    Not really, no.

Q.    Would you say that payroll is one of the biggest expenses for the company?

A.    Absolutely.

Q.    So how does the company determine whether it's bringing in enough money to pay its staff?

A.    Mr. Redmond monitored this very closely and took care of that. He liked having, you know, his finger on the pulse and knowing, you know, what contracts we had and what was coming in and what was going out.

Q.    And you said that it's Mr. Barrera, Mr. Walsh, and Mr. Redmond who took



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
89–92

Page 89

over responsibility for the KPIs?

A.   Uh-huh, yes.

Q.   Can you tell me again what KPI stands for?

A.   Key performance indicators.

Q.   Key performance indicator.
Do you recall there being a second investigation that was conducted by the Wage and Hour Division of the U.S. Department of Labor?

A.   I think there was one that was started that Attorney Downing was working on and handling.

Q.   And were you assisting her with that?

A.   She basically was handling that. You know, she would ask me questions or, you know, who do I talk to. Well, you talk to John Sardella and -- you know, she did most of that directly.

Q.   Did you participate in any of the meetings with the wage and hour investigators during the second investigation?

A.   I don't think so. I don't believe so.

Q.   Did you participate in any of the final

Page 90

conferences with Jason Mowday?

A.   You know, I recognized his name, and I know I saw documents in writing. There may have been a phone conference at Attorney Downing's office if I'm thinking about it. I don't recall who that was with. But that could have -- I do recognize the name.

Q.   What documents do you remember looking at?

A.   I don't really recall.

Q.   Tell me what you recall about the conference in Ms. Downing's office.

A.   I believe I tried -- well, I'm speculating so I don't want to speculate. I believe I was explaining the same thing about our payroll system. But really I can't -- I don't recall.

Q.   Do you remember discussing with the investigator that Bene Market paid a base rate that included automatic overtime hours?

A.   I don't recall the specifics of the conversation.

Page 91

Q.   Do you recall anything about the conversation?

A.   Not really. I do recall being in her office and having a call, but I really don't recall the specifics.

Q.   Do you recall if there was any period of time where National Brokers of America and Bene Market were operating at the same time?

A.   No. Not that I -- not to the best of my knowledge. The only possibly -- possibility would be during wind up, wind down time. You know, that would be the only way they would have been simultaneous but -- and certainly not with payroll.

Q.   What do you mean certainly not with payroll?

A.   There was a clean cut on the transfer of payroll. So there was a clean -- a clear NBoA is done, and the people were rehired by Bene Market. And if I recall correctly, I did not do it. But if I recall correctly, everybody signed new papers and new files. That is what

Page 92

I recall. Although, I didn't have involvement with that.

Q.   The location where Bene Market opened that was the same office that National Brokers of America had been operating from?

A.   It was the same location.

Q.   And Bene Market used a lot of the same equipment that had been used at National Brokers of America?

A.   I really can't say yes or no. I'm sure there was some that was transferred over to it or purchased. I believe Bene Market did a lot more investing and had purchased a lot of equipment, had purchased -- I don't know, purchased everything they need. I really don't recall the details of that.

Q.   Do you recall that Bene Market actually purchased computers and things from National Brokers of America to be used by Bene Market?

A.   I really don't know. This is -- as I said, this was going on at a time when



Page 93

I was really sick, and I was in there sporadically. And I really can't tell you that.

Q. Do you recall what paperwork the employees who left National Brokers of America and were hired on by Bene Market signed?

A. I think it was standard policies like a nondisclosure, noncompete, HIPAA regulations, emergency contacts.

Q. Were they the same forms that they would have signed when they started working at National Brokers of America?

A. Well, I'm sure they're similar by nature, but they are not the same forms. It was a new -- another company.

Q. But the same types of documents?

A. Most probably. That's the nature of the business.

Q. Were there employee handbooks at both companies?

A. I do not know. I do know that NBoA had one because I helped collate it and putting -- just organizing it and

Page 94

putting it together, not designing policies but physically gathering them and getting them in place.

Bene Market I do not know because, again, that's the period of time when I was sick. I missed about half a year of work.

Q. Are you familiar with the debts that Bene Market assumed from National Brokers of America?

A. I'm not sure of a specific debt you're speaking of. I know that Bene Market did have a good amount of debt. I'm not sure all the origination of it. Most of the origination I'm aware of was with a company called Par Funding.

Q. A company called what? Sorry.

A. Par Funding.

Q. I'm sorry. I'm not catching that.

A. Par, P-A-R, Funding, F-U-N-D-I-N-G.

Q. Par Funding.

A. So I don't know -- again, this -- this transpired when I was out sick.

Q. Right.

A. So when I came back, I basically came

Page 95

back to a new company and a new scenario.

MS. BLUER: Let's go off the record for just one second.

- - - -

(There was a discussion off the record.)

- - - -

BY MS. BLUER:

Q. What do you know about National Brokers of America filing for bankruptcy?

A. I know it was handled by Attorney Bambrick. Upon occasion they would ask me to put together a schedule this or a schedule that. I don't really recall what the schedules were off the top of my head that. That was basically handled by Attorney Downing.

Q. Do you know what caused National Brokers of America to go bankrupt?

A. Well, the issue with HII. That basically cut the company off with -- at the revenue source because it was an exclusive agreement, exclusive arrangement. And in the insurance industry, things don't happen fast.

Page 96

There's a lot of contracting and -- that goes on and a lot of steps, so it's not a quick process.

And so when HII -- when this went on with HII and Mr. Redmond decided to form Bene Market, you know, again it takes time, and you can say NBoA got cut off at the knees.

Q. Do you know what the status is of the bankruptcy filing?

A. No, not really. I haven't had anything to do with that.

Q. Even though you're the CFO?

A. Again, I have been basically retired for a year.

Q. And was the bankruptcy -- what status was the bankruptcy proceeding in before you retired?

A. Attorney Downing was handling it.

Q. When -- what position did Ms. Downing fill?

A. I would assume general counsel.

Q. And when did she assume that position?

A. I don't know exactly. Probably June of -- I'm thinking. I think it was

Page 97

around June of 2019, I believe.

Q.   And when did she leave?

A.   I believe she had -- was on like a year contract type thing.  So I believe she left June of 2020.

Q.   So Bene Market -- what kind of business is that?

A.   It is an insurance marketing agency.

Q.   What kind of policies does it sell?

A.   Health, accident, and life insurance policies.

Q.   Is that the same as National Brokers of America?

A.   Very similar, yes.  There's a similarity there.

Q.   Which insurance carriers does the company contract with?

A.   Currently or historically?

Q.   Let's start with historically.

A.   I can't tell you all of them.  I can give you some.  Let's see.  SLAICO, which is Standard Life -- it's Standard Life but the short abbreviation is SLAICO.  Washington National.  United Healthcare.  I'd have to think.

Page 98

There's a lot of contracts.  National General Life.  I could get together a list for you.  I can't really tell you off the top of my head.

Q.   How does Bene Market get its leads?

A.   They purchase -- well, the last that I'm aware of is they purchase it from a TCPA compliant vendor.  I know that there was consideration of starting a lien house or working at a lien house, but I don't know if that was done, if that exists or if that doesn't exist.  I don't know.  I'm not involved in that area of the work.

Q.   So is it a similar business operation to what was taking place with National Brokers of America?

A.   There are some similarities, yes.

Q.   What are the similarities?

A.   Well, when you sell insurance, there's going to be similarities.  The leads are purchased from a lead vendor which is Hot Leads.  If you go on the computer and you say I'm looking for health insurance and you put in your

Page 99

information, that creates a lead.  Okay.  And there's lead vendors and they -- I do not know how they harvest it.  I don't know how they do it, but they take the inquiry, and they're able to take that and supply it to insurance -- insurance marketing units.  And they -- the marketing unit does not call people.  The lead company -- their function is to identify a lead, make the connection in compliance with TCPA, and then supply it to us.  So when we get a lead, it's live.  Okay.  It's a live lead.  That is similar to both companies.

There are different carriers, different insurance companies.  I don't believe that any of the insurance that National Brokers worked with that Bene Market works with them.

Q.   Do you know roughly how much of the staff from National Brokers of America went over to Bene Market?

A.   No.  I really couldn't tell you that because in the insurance industry, in

Page 100

particular in call centers, there's a very high rate of turnover.  So my view would be faces I used to see and faces I see now, and that would be inaccurate.  So I really can't say that because, as I said, call centers do have a high turnover.  It's not an easy environment being on the phone all day.

Q.   But you do recall employees going from the one company to the new company?

A.   There were some, yes, like myself.

Q.   What about some of the hourly people?

A.   I'm sure some went over.  I can't say all.  I can't say a percent.  But I do know -- I'm sure there are some.  Most of the staff here is -- I'm trying to think of people that worked for both.  I know Jesus Barrera worked for both.  There's a lady that was -- has worked with the company 2 or 3 or 4 times.  She did work for NBoA.  She didn't work for either company for quite awhile.  And then she was hired by Bene Market.  So there are some names that went both ways.  But it wasn't



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
101–104

Page 101

necessarily, okay, here and here -- you know, from here to here.

Q. Right. You can't remember now who came across then?

A. Correct.

Q. What about the management team, did the management team move over from National Brokers to Bene Market?

A. Well, there were some changes because the one company to the other there was a gentleman, JC Marino. He was doing a lot of the sales floor, the coordination, hiring, interviewing, a combination of things. But I'm not sure which company he worked for to be quite honest with you. Again, that goes back to -- the timing is rough on me.

There was like a gentleman, Kenny Marcus, who used to work for NBoA. I don't know if he ever worked for Bene Market. And he was a licensed sales agent who was very involved in the sales floor.

Bradley Butler worked for

Page 102

National Brokers of America. Then he did not work for Bene Market for a couple years. And I think he now does some consulting for Bene Market.

So you know, it's -- when -- when a leader, an owner or a football coach or whatever, has a team he likes, they try to get the team back together as often as they can, which is why I'm in here one day a week. Okay.

Q. On your retirement?

A. On my retirement, yes.

And that just started March 31st. But you know, if you saw my name, you would go, oh, she's been there all along. No, I haven't.

So people do come and go. And I know when he has a team that he feels he has a good rapport with and can count on he wants to try to maintain that team as much as he can.

Q. At National Brokers of America roughly how many managers were there?

A. I don't know, 10.

Q. And roughly how many subordinate

Page 103

employees were there?

A. I couldn't tell you. It fluctuated so much. As I said, there was a rapid turnover. I really couldn't say.

If you look at the W-2s at year end, there was a huge number. But if you look at the active employees, it's a much smaller number. But the CPA firm should be able to give you that.

Q. From the best of your recollection, can you give me a range? Are we talking about like 10 to 15? 1,000 to 50,000?

A. Probably 40 to 50 maybe, something like that if I would guess.

Q. And are those the workers on the floor answering the telephone?

A. Everybody I would say. 50, maybe 60 even. It varied so much. We didn't -- we didn't usually -- we didn't consistently have the higher numbers. It would -- we stayed I would say for the most part 50ish, 50 and under, in that range.

Q. So there was roughly 1 manager for

Page 104

every 5 employees?

A. As I said, people changed functions tremendously. So basically, I was counting rooms. And again, I would be considered overhead. Mr. Redmond would be considered overhead. Probably Ms. Adams and Ms. Frye would have been considered overhead. So it sounds like 1 to 5, but it's not really 1 to 5 when you look at the actual sales floor and what's out there.

Q. What are the departments at Bene Market? And if it's changed over time, then let me know.

A. I don't know that I can really because again they have made changes since I have been gone. And so I --

Q. Let's start with Bene Market. When you came back from your sick leave, what was hierarchy of the company?

A. It was a similar hierarchy to NBoA. There was similarity. There was -- I believe at that time the sales floor combined two of the departments that had been working, you know, in name,

Page 105

not in people, which would have been the qualifying specialist and the agents. I believe they were all one department.

There was verification at one point in time but there wasn't always. I believe what happened is verification and customer service I believe they merged. And I believe there was a new billing department developed. But billing is not in the traditional sense of billing when people think of billing. I'm trying to think of how to define it. I don't know.

Obviously there was a business intelligence department. And then there was an admin. There was an admin department. I'm visualizing.

Q.  Is that the same as the HR department or something different?

A.  I believe that was different. I believe that -- that was where Ms. Crane was -- was in administration. She was the administrative assistant to Mr. Redmond and -- before she got ill.

Page 106

And then -- I'm trying to think. You're really working my memory here.

Q.  You will have earned your dinner.

A.  Does that mean I get to have my husband take me out?

Q.  Absolutely.

Did you have a business intelligence department at National Brokers of America?

A.  No. I don't -- I don't believe we did at that point in time. I think that any information systems, any computer related -- I believe that came -- that sounds strange. But I believe that came under the VP of marketing which was Bradley Butler. He -- I'm pretty sure he oversaw that function. Because like I said, there's -- how do I say this? We have always worked more at any company -- me especially at any company more by function and what needs to be done than by titles.

So I'm not big on titles. I never have been. So I really believe Mr. Redmond is pretty much the same

Page 107

way. He might want to give people these titles. But it's more a matter of working in a function and getting whatever function you are working at done and done effectively.

Q.  So what does the business intelligence department do for Bene Market?

A.  Now that we have that it's actually really cool. They do a lot of analytics. They do a lot of analytics on products, which products are more profitable than other products, where there's -- you know, what sells where, you know, the performance of the agents, you know, who sells what. We have a much better system than we did. So it's been a great add to have business intelligence brought in.

Q.  Did Bene Market start with a business intelligence department, or did that come later?

A.  I am unsure of when that started. Mr. Barrera was hired under National Brokers, and he worked under Bradley Butler. Now as to at what point in

Page 108

time that changed -- because as I said, Brad worked for a while and then departed and formed his own company. And at that point in time that's about when the business intelligence department was formed.

Q.  And Mr. Barrera heads that now?

A.  Yes.

Q.  What does the billing department do?

A.  I have to think. I'm trying to think. I'm not sure what they do. I'm really not sure.

Q.  Did you have a billing department at the National Brokers of America?

A.  We didn't really have a billing department at National Brokers of America. You know, there was the customer service.

I'm trying to think. There was a better descriptive word for the billing department. I'm just trying -- I can't recall what it was. I'm sorry.

Q.  That's okay.

So you have these various departments. Who do those department



Page 109

heads report to?

A. Mr. Redmond. Mr. Walsh and Mr. Redmond.

Q. And would you say that they are parallel in the hierarchy, or is one above the other?

A. Mr. Redmond would be at the top of the hierarchy.

Q. And does Mr. Redmond still interact with those department heads independently?

A. I'm unsure. I do know that a lot of -- there's a lot of meetings held by Mr. Walsh and Mr. Barrera when Mr. Redmond is not present. So I don't know exactly when that -- who, what, when, where, and why.

Q. When did Mr. Walsh come on board?

A. It's been a few years. Probably 2018. I think 2018.

Q. And what is his title?

A. I do not know what his title is right now.

Q. Do you know what his job title was before you retired?

Page 110

A. I'm thinking. No. He used to do a lot of training. He did agent training.

As stated before, we were very -- we like our employees if they show the ability we like them to study and get licensed so they are licensed sales agents no matter what their functions.

I will give you an example of that. Mr. Barrera is now a licensed agent. He does not sell insurance on a regular basis. But he -- you know, again to achieve the knowledge, just as I did. And I did that in -- I think it was 2019.

Q. Who do the hourly employees -- that makes it hard to figure out who I'm talking about. Strike that.

Tell me the hierarchy for the employees on the ground who are answering the phones?

A. Are you talking customer service or --

Q. Any of them. If you can just go through and tell me, you know, who supervises the worker bees and then who

Page 111

supervises those people?

A. It would be the department head that oversees them. And then really I'm not sure anymore. Probably Mr. Walsh and Mr. Barrera.

Q. So at Bene Market do you have the authority to discipline employees?

A. Bene Market? We had a lady -- her name was Nashanta Benson, and she had come to us from Starbucks, and she took care of our HR function. I can't think how long she was here, a year or two. But she worked for Bene Market, and she took care of that and took care of employee relations and that whole gamut.

Q. Could you spell her last name, please?

A. B-E-N-S-O-N.

Q. And for National Brokers of America, who handled employee discipline?

A. Probably it would have been Joshua Wespendorp and Jamie Bridenstine.

Q. Sorry. I was frozen there. I didn't hear any of that.

A. Okay. For NBoA I would say probably

Page 112

Joshua Wespendorp and Jamie Bridenstine, maybe Bradley Butler.

Q. Was Mr. Redmond at all involved in employee discipline?

A. I'm unsure.

Q. Were you involved in any employee discipline?

A. No.

Q. Did you supervise any employees?

A. No.

Q. Did anybody report to you?

A. No.

Q. If anybody had questions about their paycheck at National Brokers of America, would they come to you?

A. No. They would go to Ms. Crane or I think Ms. Adams, Ms. Klinger, Mr. Sciumbata.

Q. And what about at Bene Market, would employees come to you if they have questions about their paycheck?

A. No. Here -- I'm trying to think of who. Well, when Nashanta was here, they would go to her. But we commonly called her Tay was her nickname. So



Page 113

when I say Tay, I'm referring to Ms. Benson.

Also, a gentleman who used to work here, Brent Furrie. He was very involved out on the floor, and he would do -- be charged with discipline and that type of thing.

Q. Could you spell his name, please?

A. Brent and last name is Furrie, F-U-R-R-I-E.

Q. Do you know if Mr. Redmond is involved in the hiring of employees at Bene Market?

A. I don't know. I don't -- he would not be involved in the hiring and the day-to-day operations, no.

Q. What about at National Brokers of America?

A. I don't think so.

Q. Is Mr. Redmond involved in firing of employees at National Brokers of America?

A. Are you saying actively saying you're fired to anybody? No, no.

Q. What about in the decision making

Page 114

process prior to terminating someone's employment?

A. He might or might not have been. You know, if he had an opinion, he would definitely voice his opinion. And I'm sure he was -- anybody that was fired I'm sure he would have been apprised of it beforehand so he would be aware.

Q. And at Bene Market is Mr. Redmond involved in the firing of employees?

A. Not to the best of my knowledge.

Q. Would he be consulted?

A. I imagine so. I would expect so.

Q. Have you ever been present when there's been discussions about letting people go?

A. The only discussions would have been maybe, you know, in a layoff type of discussion, not anybody being fired for performance or anything like that.

Q. Have there been any layoffs at Bene Market?

A. I don't know if that's the right terminology. The -- one of the reasons for the high turnover at either company

Page 115

but especially at National Brokers of America was that when they would interview people they would do group interviews. They would bring in 20 or 25 people and interview them as a group and then offer a job to -- it could be anywhere from 1 to 20 of them depending on the need at the time. And they would be brought in and trained.

And then basically in about 2 to 3 weeks you know whether this is their thing or not, you know, whether this is the right environment for them. Because as I said it's a very strenuous environment when you're on the phone all day with people. It's -- not all of us -- I'm not made for it. I know that.

And so this is one of the reasons you had such fluctuations. So many times they would term that as a layoff. So that's why I say the terminology may not be what we traditionally would view as a layoff.

Q. And who would decide if an employee

Page 116

doesn't seem cut out for the job?

A. It would be their supervisor, their department head. It would be sometimes them. You know, many times they would say I can't do this.

The way I would explain it -- if someone asked me I would say if you want to come in and have a cup of coffee, get on the phone, make some calls, go get a snack, you know, take a few more calls, this is not the company for you. Okay. It is hard work and it's nonstop hard work. And I know as a human being it's not easy to be on the phone and have people say no to you.

So many, many people would work for a week or two or maybe three and say -- well, most people that quit wouldn't work for a few weeks. Those people within 10 days would say I can't cut it. I can't do it. It's too hard. So you know, it was a -- many times it was a mutual thing.

On occasion somebody would



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
117–120

Page 117

say I love this company, but I really can't do this. Do you have any other position for me. And if they had the capability that was being looked at, then they might be hired to -- you know, okay, you may go to customer service or you may go to verification, whatever.

Q.    Who was responsible for determining the pay policies at Bene Market?

A.    Well, again, the timing -- it's difficult for me to -- I'm not really sure because I think that a lot of that took place when I was out.

I know that when I came back they had hired Ms. Frye, Sara Adams Frye. She had been hired by Bene Market. And I know she -- she worked very closely with the sales staff and the employees. So I'm sure she, you know, worked with that to some degree. I'm trying to think who else.

Q.    Did you say Sara Frye?

A.    Yes, ma'am.

Q.    Did she adopt the pay structure that

Page 118

you developed with the overtime built into the base pay?

A.    I believe so, yes.

Q.    Who decided at Bene Market which positions would move into the base pay with the --

A.    Say that again. I apologize. You cut out.

Q.    Who at Bene Market decided which positions were going to switch from the hourly pay to the base pay with the bonus option?

A.    Most people were hired into the base pay position. Okay. Most people were hired -- because that's actually one of the harder positions to fill. So it was if you hire somebody into that and you say, hey, we really like this person, they have got a lot of capability, this isn't their position, then those are the people who would then be offered a position in verification or customer service or what have you because of recognizing that they had good abilities. They had

Page 119

good work ethics. You know, they were an employee that we wanted to maintain, although the sales floor wasn't the right venue for them. So that is more the direction you can go.

Q.    What is the name of the position that we're talking about?

A.    The qualifying specialist.

Q.    The qualified specialist?

A.    Qualifying specialist.

Q.    Qualifying specialist.

So most people are hired in at Bene Market as a qualifying specialist. And if you have some ability, you might be moved to a different department that requires more skill?

A.    If you are unsuccessful as a qualifying specialist, if you were not able to perform that job in a level that's going to make you a success -- we went everybody to be a success. And if a person is hired into that and it was just obvious that wasn't their forte and they had some other skills that we

Page 120

identified, then they might get transferred into another department.

Or many times they would come and they would request to be transferred to another department. They would say I like it here. I don't want to leave, but I can't do this job. It's not me.

So at that point in time, we -- I'm sure Ms. Frye -- the department heads, you know, would discuss is this a person that we want to keep; is this a person that we want to keep within our organization.

Q.    So with regards to National Brokers of America, are you aware of any steps that were taken by the company to comply with the Fair Labor Standards Act after that first investigation?

A.    Oh, yeah. At that point in time, the CPA firm was told we don't ever want this to happen again. This needs to be completely complied with and rectified. I said: We don't want to ever go through this again.

STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
121–124

Page 121

Q.    And that's when you developed that new pay structure?

A.    Correct.

Q.    And you don't recall how much involvement John Sardella may have had with that?

A.    He would have been heavily involved because he's the one that actually handles the payroll. As to 50 percent, 60 percent, 40 percent, I don't know.

Q.    Was there anyone else working on that other than you and he?

A.    I don't believe so. I don't believe so. Possibly JC Marino was the only one I would think. Because he was the gentleman that did the -- a lot of interviewing and training and that type of thing.

Q.    But you don't recall if he was involved or not?

A.    No, I can't. I'm sure his input was sought.

Q.    And you believe that Mr. Redmond signed off on everything at the end before the changes were put in place?

Page 122

A.    Absolutely.

Q.    Because he's the owner?

A.    Yes.

Q.    After the second wage and hour investigation, the one that we're talking about, the one that brings us here today, were any changes made to the pay practices at Bene Market?

A.    I don't really know because that was really in the process at the same time that I was starting to work less and retire. And I really didn't have anything to do with payroll at that point in time. So I cannot really answer that question.

Q.    At what point in time did you have something to do with payroll?

A.    Oh, I have never really had a lot to do with payroll. I never really -- more of just -- I have not had much to do with payroll at all. I would communicate with Mr. Sardella more on a -- not a payroll basis, just on an accounting type of basis. Getting -- they have always kept -- basically they

Page 123

keep our books. So I would, you know, say, okay, here I need data on, you know, quarterly trends or, you know, what -- I need a revenue census for the last 2 years or that type of thing. And that was all maintained on their system.

Q.    How is their system differ to the records that Bene Market keeps?

A.    They are two entirely different things. Bene Market doesn't keep the financial system. Smith Elliott Kearns & Company -- I'm sorry, another company. C. Malcolm Smith & Company maintain that.

What's maintained here is more performance management system. It's a -- tailored to insurance companies and productivity of employees, that type of thing, not an accounting system. There's no accounting system here.

Q.    Is there a time tracking system now?

A.    Yeah. I do believe that the way they do it now is it's a system called

Page 124

Five9. That's F-I-V-E and the number 9.

And basically -- again, Mr. Barrera can tell you this much more eloquently than I can. It's a phone system that we use. And basically it is the phone system that the lead vendors drop the leads into. And it is the system that pulls the lead with the qualifying specialists and puts them together, okay, for a potential customer.

And that is a phone system where they have headsets and a microphone. And so basically I believe -- I believe, to the best of my knowledge, I believe that the -- when they get in here in the morning, they log onto the system and they're on it all day until they have to leave. And I believe that that is the -- where they maintain their time tracking from.

Q.    And when you say that you believe that, what do you base that belief on?

A.    That's what we used to do. So I

STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
125–128

Page 125

believe they are still doing that. That was transitioned to -- I'm thinking probably 2019 that was transitioned to. It might have been somewhere -- I think somewhere in 2019 they started using that system.

Q. And prior to 2019 what system were they using to track time?

A. I believe that was just the sign-in sheets that I described earlier to you. And those were maintained by whoever was supervising the floor, Ms. Frye, or Mr. Furrie, Mr. Barrera.

Q. Do you recall when it was that they switched from Zoho to the sign-in sheets?

A. It would have been somewhere around July of 2017 because it was when I was out. And I was out from July to September. So I'm pretty sure that would be when it is.

Q. At Bene Market who determines what schedules the employees are going to be on?

A. I would assume Mr. Walsh. It's a

Page 126

pretty standard schedule, standard work hours. So the standard day I believe. I believe to the best of my knowledge it's like 8:30 to 6, I believe.

But there are again some departments that work altered hours. But that basically would be on a department basis to the best of my knowledge, not an individual basis.

Q. And does Mr. Redmond have to sign off on any changes to these schedules?

A. I'm sure. I'm sure he does, yes.

Q. And what about when employees works on a weekend, are you responsible for approving that?

A. If they work on the weekends?

Q. Yes.

A. You cut out.

I believe that would be approved by Arthur and -- by Mr. Walsh and Mr. Barrera. I'm sure that Mr. Redmond is aware of it too.

Q. Who is responsible for -- who was responsible for advertising at National Brokers of America?

Page 127

A. Advertising. Advertising for employees or advertising in general?

Q. Well, I was talking about advertising for employees, but I will ask you generally. I will ask you about one and then the other.

So what about who was responsible for advertising vacant positions?

A. You know, we had a gentleman here. His name was Shane Klopp, K-L-O-P-P. And he did a lot of recruiting and advertising and, you know, like going to job fairs type of thing. He was doing that for a bit.

Then once Nashanta came, Nashanta Benson, she would have been doing that. And I believe Ms. Frye did it some too. Again, people change hats a lot.

Q. Were you responsible for paying for the advertising?

A. The -- well, again, are you talking about advertising for employees?

Q. Yes.

Page 128

A. Indeed or -- they use Indeed or Career Builder. Basically that would be setup on -- we didn't do a lot of payments out of the company. Those payments were set up as automatic payments with electronic fund withdrawals.

Q. And so is that something that would go through you as the CFO?

A. Well, it would go through Mr. Redmond, you know. Mr. Redmond would approve, you know, the payments, and then I would facilitate them. Prior to that, you know, Mr. Sardella. They had the checks. We didn't -- for a long time we did not even have in-house checks.

Q. Who would review the advertisements when they were posted?

A. What, the advertisements?

Q. Yes.

A. That would have been Shane Klopp or the people I named before. Usually I believe Mr. Redmond would look at them also.

Q. So would Mr. Redmond sign off on them

Page 129

before they were published?

A.  Yes.

Q.  What about Mighty Recruiter, did you do any contract or payments to Mighty Recruiter?

A.  I'm not aware of any.

Q.  Who was responsible for maintaining Bene Market's Facebook page?

A.  Probably a couple people had their hands in that.  I'm thinking probably Ornella Sciumbata.  I think she was pretty involved in that.  And then subsequently I would say it was then Nashanta Benson.

Q.  Did Bene Market ever have a website?

A.  I don't believe Bene Market has ever had a website.

Q.  Did Bene Market ever pay for a web page where people could apply for jobs?

A.  I am unsure.  I think there was something in conjunction with like Indeed, but I'm not sure about that.  I really don't know.

Q.  Did you ever see any of the advertisements?

Page 130

A.  I don't think so.  I might have back at in the NBoA world, but I really had nothing to do with that.

Q.  So how are you doing?  Do you need a break, or would you like to push on?

A.  How about a 3-minute break.

        - - - -

(There was a recess in the proceedings from 1:53 p.m. to 2:10 p.m.)

        - - - -

BY MS. BLUER:

Q.  We can go back on.

        Ms. Miller, we have been talking about advertising that National Brokers of America and Bene Market have been doing.  And I would like to show you a couple of documents to see if you recognize them.

        So I'm just going to share my screen here.  This will be marked as Exhibit 1.

A.  Okay.

        - - - -

(Exhibit 1 was marked for identification.)

        - - - -

Page 131

BY MS. BLUER:

Q.  So on your screen you can see a document that says Bene Market LLC Talent Network at the top.

        Do you see that?

A.  I do.

Q.  And I'm going to just scroll down so that you can see the whole document.

        There's a picture of somebody with -- holding their hands apart with little people and it says Careers at Bene Market.

        Do you see that?

A.  I do.

Q.  Are you familiar with this document?

A.  It's the first time I've seen it.  I like it.  I'm going to guess that probably Nashanta Benson would have done that because that -- I think that's around the time she was here, and she's very talented with that.  But I don't know.  That's the first time I have seen it.

Q.  So I'm looking down to the second page of this advertisement.  And it says:

Page 132

Our company, National Brokers of America, is the Reading areas leading health insurance brokerage company.

        Do you see that?

A.  I see that.

Q.  How often would your company use the name Bene Market and National Brokers of America interchangeably?

A.  That should never have been done.  They are two different companies.  So I'm not really sure who did that or where they did that or -- that's completely new to me.

Q.  Okay.  Have you ever seen Bene Market's Facebook page?

A.  No.

Q.  You had mentioned Indeed.com a little while ago.  Do you remember that?

A.  I did.

Q.  So I'm going to show you what purports to be an advertisement on Indeed.com for customer service representatives at Bene Market.

A.  Okay.

        MS. BLUER:  That will be



Page 133

marked as Government Exhibit 2.

- - - -

(Exhibit 2 was marked for identification.)

- - - -

BY MS. BLUER:

Q. Okay. Do you see that document?

A. I do.

Q. Have you seen this advertisement before for Bene Market?

A. No, I have not.

Q. Have you ever reviewed advertisements like this when approving -- submitting payment for these services?

A. No.

Q. All right. I am going to show you one more.

A. Okay.

MS. BLUER: This will be marked as Exhibit 3.

- - - -

(Exhibit 3 was marked for identification.)

- - - -

BY MS. BLUER:

Q. This is an advertisement that was on mightyrecruiter.com.

Page 134

Have you ever seen this before?

A. I was there when the picture was taken.

Q. Tell me about when that picture was taken.

A. That was taken -- it was December of either two thousand -- I think 2016. And the company was doing very well and Mr. Daymond John came out to our Christmas party and gave the employees a talk, a lecture, a motivational lecture. It was a very nice evening.

Q. And who is David John?

A. Daymond John.

Q. Daymond John.

A. He's from the Shark Tank.

Q. Sorry. I only have basic cable. Have you seen this advertisement before?

A. I have not. But I do know Mr. Redmond was very proud of that accomplishment.

Q. Very proud of that what? I'm sorry.

A. Accomplishment.

Q. That accomplishment.

Page 135

That this person came to your party?

A. Uh-huh.

Q. Is he a famous entrepreneur?

A. Yes.

Q. I have heard of the show.

MR. RUSH: The English version is Lions' Den.

MS. BLUER: I've heard of that.

BY MS. BLUER:

Q. Ms. Miller, are you familiar with a company called Express Benefits?

A. Yes. It's a DBA.

Q. What is that?

A. Doing business as. It's a -- it's a DBA.

Q. Doing business as. Sorry. It's a doing business name for which company?

A. I believe Bene Market.

Q. So Bene Market also does business as Express Benefits?

A. They did, yes. I don't know if they still do or not.

Page 136

Q. What period of time were they doing business under the name of Express Benefits?

A. I'm sorry. I can't tell you that. I'm unsure of that.

Q. Do you remember if it was before or after your sick leave?

A. I don't. It would be conjecture. I could guess but I don't want to guess. But I believe Bene Market is the one that produced that as a marketing name.

Q. And did you ever have to pay bills under Express Benefits?

A. I don't believe so.

Q. How did you come to know about Express Benefits was being used as a marketing name for Bene Market?

A. Because it's common practice in business to have some DBAs so that -- especially in the insurance industry so that -- you know, for different products you might want to use different doing business as. They're all -- it's always registered with the state.



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
137–140

Page 137

Q. Whose idea was it to have this DBA?
A. I believe Mr. Redmond.
Q. Did Bene Market have any other DBAs?
A. Yes.
Q. What were they?
A. I -- I don't know that I can remember them all. But I do know there was one that like Bene Mall -- Benefit Mall I think it was. I don't believe it was ever used. There may have been -- I was thinking there was three approved, but those are the ones that I remember.
Q. What about Trifecta?
A. That's a separate company.
Q. What company is Trifecta?
A. I really haven't had much to do with that. It is -- so I'm not the best person to answer that. I think they're a third-party administrator, but I'm unsure, which is a different function.
Q. What is a third-party administrator?
A. A third-party administrator basically does the work on behalf of an insurance company, but they don't take the risk. They are not an insurance company.

Page 138

Bene Market is simply a marketing company, a marketing broker agent. Trifecta would be -- to the best of my knowledge -- I could be wrong. To the best of my knowledge is a third-party administrator. Those are two different things.
Q. Is Mr. Redmond the owner of Trifecta?
A. I believe so. I believe so.
Q. And how did you come to learn about Trifecta?
A. He had asked me to help him set up the company.
Q. Are you a co-owner of Trifecta?
A. No, I am not. I believe there is a co-owner, another gentleman. His name is Seni Sok.
Q. Sorry?
A. Seni, S-E-N-I, Sok, S-O-K.
Q. And what about Seguro?
A. Seguro is another marketing agency.
Q. It's a different company that does insurance brokering?
A. Yes.
Q. Is it separate from Bene Market?

Page 139

A. Yes.
Q. And is Mr. Redmond the owner?
A. Yes.
Q. Is he the sole owner?
A. I believe there is -- I'm not sure. No, actually, I don't think he is the owner of that one. I'm not sure. You would have to check with him. I don't believe he owns that.
Q. And how do you know about Seguro?
A. Because I originally helped him set it up. He wanted to run a different type of product through it.
Q. Do you know where Seguro is registered?
A. I believe in the State of Delaware.
Q. What about Trifecta?
A. I believe that's Pennsylvania.
Q. So other than Express Benefits and Benefit Mall, are there any other DBAs of Bene Market?
A. I don't think so. I thought there was a third one that was set up at the time, but I don't recall it, and I'm sure it was never used either.
Q. Was Express Bene --

Page 140

A. That -- you know what, it might have been -- no, Express Bene was one of them. Express Bene and Benefits Mall. But I thought there was a third one that was never used.
Q. Is Express Bene the same as Express Benefits or different?
A. Oh. I'm not sure. I would -- I think Express Bene is just a short reference, like a nickname type thing. Sorry. It was both the same name in my head.
Q. We talked about the sign-in sheets. And I'm going to show you an example just to see if we're talking about the same thing when we talk about sign-in sheets.
         This should be Exhibit 4.
              - - - -
(Exhibit 4 was marked for identification.)
              - - - -
BY MS. BLUER:
Q. Do you see a sign-in sheet there?
A. I do.
Q. It says BM attendance?
A. Excuse me?



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
141–144

Page 141

Q.    BM attendance.

A.    I see that.

Q.    Does this look like one of the sign-in sheets that you were talking about?

A.    I don't know. I don't think so.
        Yeah, I'm sure it's the same thing. The one I had seen before was I think a couple years earlier, and it was all manually written. I haven't seen this.

Q.    Do you recognize any of the names?

A.    Excuse me?

Q.    Do you recognize any of the names?

A.    Yes.

Q.    Which names do you recognize?

A.    Mr. Groff. I think Mr. Mendez worked for a while. Ms. Robles. There were two Robles so it's hard to --
        Mr. Walsh. I mean, I can go down this.

Q.    Is this format consistent other than the typed portions with the sign-in sheets that you remember?

A.    I don't know. I really don't know that. I just know they were handwritten. I think they were daily

Page 142

sheets. That looked like a weekly sheet or something. I'm not sure. So I think they're two different things.

Q.    The sheets that you remember did they have a spot for signing out as well as signing in?

A.    I would assume so. I don't know. Again, I just know there was a sheet on the counter, and I said what the heck is that. You know, I came back I was like what's that. Well, that's the sign-in, sign-out sheet. You know, why are you doing that. And I never did get a clear answer on that.

Q.    Do you remember responding to some Interrogatories that I had sent?

A.    Is that the one I just did a few days ago? Yeah.

Q.    They were questions that you were asked to answer.

A.    Uh-huh.

Q.    Let's take a look at the Interrogatory responses.
        - - - -
        (Exhibit 5 was marked for identification.)

Page 143

        - - - -
BY MS. BLUER:

Q.    So question number 2 asks you to identify by name and if you know the address and telephone number for any people who might have information that are relevant to the Complaint in this matter. And you identified C. Malcolm Smith.
        Are there any other individuals that you believe should be added to this response as people who could have knowledge of the practices that are at issue in this case?

A.    Mr. Walsh, Mr. Barrera.

Q.    So what information would Mr. Walsh have?

A.    Just with overseeing the floor they might have -- sorry. I'm looking for my forms.
        With overseeing the floor they might have relevant knowledge. I don't know that they would.

Q.    What about Mr. Barrera?

A.    Again, he works with performance all

Page 144

the time so that would be (witness pause) --

Q.    He looks at the performance did you say?

A.    Yeah. He's business intelligence. He works with performance management.

Q.    The lady who used to do the payroll before she got ill would you say that is somebody that should be on this list?

A.    No. I wouldn't think so. She was diagnosed with multiple sclerosis, and I don't -- how do I say this politely. I don't think -- I don't think she would remember. Her brain seems to be affected by the diagnosis.

Q.    So her capacity might be affected. But do you think that if her capacity wasn't affected that she would have information that would be relevant to the case?

A.    I do not know. I do not know. I don't think so because she wasn't involved. I don't think.

Q.    This Complaint actually applies to both



STEPHANIE F. MILLER                                    April 29, 2021
MARTIN J. WALSH vs BENE MARKET                         145–148

Page 145

National Brokers of America and Bene Market because it covers from 2016.

A.   Okay. I really don't know.

Q.   But she was the person who handled payroll before she got ill?

A.   Yes, absolutely.

Q.   And what was her name?

A.   Jamie, J-A-M-I-E, Crane, C-R-A-N-E.

Q.   What about John Sardella?

A.   He works for C. Malcolm Smith & Company.

MS. BLUER:  We will enter into the record as Exhibit 5 your responses.

And you have your copy there so you are able to see your answers?

THE WITNESS:  I do, yes. Thank you.

BY MS. BLUER:

Q.   So the next question says: Describe separately in detail all the facts that form the basis of or in which defendants rely in support of any affirmative defenses listed in their answer to the Complaint in this matter

Page 146

or that defendant intends to raise going forward.

And your response is that: Answering Defendant cannot reply to this question as she had no part in answering the Complaint referenced and in no way participated in such answer.

Do you see that?

A.   Yes, I do.

Q.   So does this mean that you need to file an answer in this case, that your -- your position is that the answer that was filed so far does not apply to you?

A.   I have -- I have never seen -- the first -- the first I have seen of this was when these questions were given to me, which was last week.

MR. RUSH:  Hold on. Can you hear me?

MS. BLUER:  Yes.

MR. RUSH:  I can't hear anybody.

MS. BLUER:  I can't hear anybody.

MR. RUSH:  Can you hear me

Page 147

now?

MS. BLUER:  Yes. Now I can hear you.

MR. RUSH:  Okay. The answer to this Complaint was filed whenever it was filed, before I was even aware this case existed without any discussion with Ms. Miller. She in no way contributed to the answer that has long ago been filed.

If you're going to allow her to file her own answer to the Complaint at this late date, that's fine. But the time to do so had already passed. And the answer that was filed was filed on her behalf and on behalf of all the defendants.

MS. BLUER:  That's right. The answer that was filed was filed on behalf of all the defendants by the attorney that represented them at the time.

MR. RUSH:  That's correct. She was not shown the Complaint or the answer at the time that was done.

Page 148

MS. BLUER:  So is it Ms. Miller's intention to not raise any affirmative defenses in this case?

MR. RUSH:  Well, we obviously have a difficult decision. Defenses were filed on her behalf but without her knowledge.

MS. BLUER:  Well, it says any affirmative defenses listed in their answer or that they intend to raise going forward.

MR. RUSH:  Yes. But something was filed without her -- do you understand what I'm saying?

THE WITNESS:  I have never even see this answer. I have never seen --

MR. RUSH:  Hold on. So to come up with affirmative defenses -- do you understand the position of contradicting what might already be -- I mean, there might be the need to bifurcate the case on some level.

MS. BLUER:  I'm not sure how that --

Page 149

MR. RUSH: If they contradict each other, I cannot possibly continue representation. And then we're going to be back in front of the judge, and I'm going to be withdrawn from one or three.

MS. BLUER: So you're saying that you believe that there's no conflict of interest and that you can't represent all the defendants?

MR. RUSH: That is not what I'm saying. What I'm saying is prior to my involvement at all an answer was filed on behalf of this defendant without her knowledge or input. That is not to say we waive any affirmative defenses. That is to say that her job in answering your Interrogatories was to do so honestly and not to commit perjury. And so she did and has.

You're encouraging her to lie on a court document right now. I can't possibly --

MS. BLUER: I'm not encouraging anybody to lie. I'm asking

Page 150

the witness to testify as to whether --

MR. RUSH: On something she has no knowledge. And you're criticizing her for not correctly answering Interrogatories involving a document that was filed by an attorney on her behalf without her knowledge. She has no knowledge of it. She didn't participate. That doesn't mean she's waiving any affirmative defenses. That doesn't mean she doesn't have them. What that means is that somebody violated their duty to her as a client, and she has no knowledge.

She answered your Interrogatory honestly. What you're getting into now is a separate conversation about legal strategy. And I'm going to advise her not to answer anything involving her legal defense or any strategy going forward because it would be part of attorney-client privilege.

MS. BLUER: My question is, first, to whether or not she's

Page 151

intending to raise any affirmative defenses, which she can answer or not, and she can tell me her knowledge. But to take the position that you can give me facts that pertain to affirmative defenses and still be able to raise them down the line that's not true. You can't refuse to answer discovery. Tell her not to answer questions in the deposition and then expect to be able to raise affirmative defenses down the line. That's not how it works.

MR. RUSH: She may not be able to make those -- answer those questions now. She might not have the knowledge to do so and may have to supplement or provide those answers at a later time.

MS. BLUER: And she can answer those questions honestly.

MR. RUSH: If she knows. Without my -- without my interference at all, please feel free to question my client about affirmative defenses that she has to the charges in the

Page 152

Complaint.

MS. BLUER: As I will. I will follow up with my deficiency letter and, you know, my motion to -- you didn't answer the question.

MR. RUSH: If she can answer it.

MS. BLUER: I mean, she has an attorney representing her also who helped her, you know, respond to the discovery.

MR. RUSH: I object to that statement. That is patently ridiculous. I in no way helped her respond to any discovery. The answers are her own. Don't accuse me of something like that. All right. You want to talk about violations and deficiencies, don't start. Don't start. You know the rules. If you want to continue this in a civil manner, please do.

BY MS. BLUER:

Q.    Ms. Miller, are you aware of any affirmative defenses that you intend to



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
153–156

Page 153

raise in your defense in this case?

A.   I have no knowledge of any of this. I have not seen a Complaint. I have not seen an answer. I don't know. I can't answer this because I don't know.

Q.   You haven't seen the Complaint?

A.   No. I wasn't even aware of the Complaint.

MR. RUSH:  Prior to my involvement.

THE WITNESS:  Yeah.  Prior to last week and still have not seen it.

BY MS. BLUER:

Q.   When Mr. Bambrick was representing you, you didn't see the Complaint at that time either?

A.   Mr. Bambrick never called me. I have no idea -- I had no idea of any of this.

Q.   When did you first become aware of this case?

A.   Last Wednesday. Last Wednesday I was given the Interrogatory and asked to answer it. I answered it on Thursday. And that was my complete involvement.

Page 154

Q.   You have never had any discussions with Mr. Redmond about the suit that was filed by the Department of Labor?

A.   No.

MS. BLUER:  So Mr. Rush, you have not given Ms. Miller a copy of the Complaint and the answer either?

MR. RUSH:  Without getting into any attorney-client privileges, I can say she hasn't reviewed every document in this case. I have to leave it there at this time. As of the time that we provided answers to the Interrogatories, no, she had not.

BY MS. BLUER:

Q.   So Interrogatory Number 5 says:  List the date that National Brokers of America, Inc., and Bene Market were established and, if applicable, ceased operation. Identify all documents that memorialize this information.

And I know that you have testified roughly to your memory as to when National Brokers stopped selling insurance and why Bene Market started.

Page 155

Are you aware of any documents that might exist that would contain that information?

A.   Well, I assume that a certificate of organization would.

Q.   And have you seen one of those?

A.   I have, not for a long time.

Q.   What documents do you have in your possession that pertain to your ownership interest in Bene Market?

A.   I have the agreement from Mr. Redmond and myself.

Q.   So I'm not sure if that has been produced or not. But I believe that that would be responsive to this request. So I would like a copy of that, please.

A.   It might take me a little bit to dig it out though.

Q.   Interrogatory Number 6 asks that you identify all management employees or agents of National Brokers of America and Bene Market who have knowledge of or were involved in decisions concerning the entity's compensation

Page 156

policies.

And you have identified Alan Redmond, Arthur Walsh, and Jesus Barrera.

Is there anybody else that you think should be on that list?

A.   Well, again, it depends on the time period and -- they're your basic decision makers.  Again, people come and go but these are your basic decision makers.

Q.   So for Bene Market, would all three of those people be on that list?

A.   I believe so.

Q.   What about for National Brokers of America?

A.   Mr. Walsh would not be because I don't believe he worked at National Brokers of America.

Q.   What about Mr. Barrera?

A.   Yes. He worked with National Brokers of America.

Q.   Is there anybody else?

A.   I don't think so. These are -- you know, Mr. Redmond is the primary person



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
157–160

Page 157

that would -- made the decisions. Mr. Redmond was the final decision maker for the compensation policies.

Q.   So if there's something that I think the answer is already pretty complete in the record -- I'm trying to skip through, or at least give you a chance to answer it.

A.   Okay.

Q.   If it's something like a couple of names, just to make sure you don't remember anybody else.

So number -- Interrogatory Number 10 says:  Describe in detail all records and policies of defendants, oral or written, concerning hours worked, the working of overtime hours, all the payment of overtime by defendants, and identify all documents that reflect such rules and policies.

And you had said that the answering defendant cannot answer this.

And I know we discussed, you know, the schedules of the employees and those kinds of thing earlier.  My

Page 158

question is are there any documents that exist that memorialize the schedules for the employees?

A.   I'm not aware of any.  I would not know.  There might be some here.  I don't know.

Q.   When you were putting together the employee manual for National Brokers of America, do you remember if there was a section that pertained to overtime?

A.   I don't believe so.  I don't recall completely, but to the best of my recollection I don't believe so.

Q.   Were there any posters or flyers or anything on the notice board that pertained to schedules or work rules regarding overtime?

A.   Not that I'm aware of.

Q.   Question 11 asks if prior to learning of the Department of Labor's investigation relating to this matter did the defendant ever take any steps to determine whether it's pay practices complied with the Fair Labor Standards Act.  And it says: If yes, describe in

Page 159

detail all actions that were taken to determine whether the policy was in compliance.  Identify all persons who were consulted regarding whether the policy was in compliance and the date of such actions.

And your answer is:  I have no information or belief or reason to believe that these laws were not followed.

A.   I believe all that information would be with C. Malcolm Smith & Company since they were doing the payroll.

Q.   So when you say that you have no reason to believe that these laws weren't followed, is that accurate since you were participating in meetings with the federal investigators about the Fair Labor Standards Act violations of the companies you were working for?

A.   Well, my involvement was more trying to clarify and explain to them how the payroll -- how the compensation worked.  The Fair Labor Standards Act that was more Attorney Downing's deal.  My

Page 160

function was more to explain how our compensation worked.

And to the best of my knowledge because I'm very -- what's the word -- conservative about it and I believe in complying with law to the letter.  So to the best of my knowledge, that's why it was designed the way it was so that there was no doubt that it would be compliant with the Fair Labor Standards Act.  So I have no reason to think it wouldn't be.

Q.   So correct me if I'm wrong.  But I thought your testimony earlier was that after the first wage and hour investigation before the second one you were involved in developing this pay structure where overtime was built into the base rate and that you worked probably with John Sardella to come up with this new pay system as a result of prior violations that had been discussed with you by Steve Fedock?

A.   Yes.  That was done as soon as Mr. Fedock discussed this with us.  It



Page 161

was immediately addressed. So again, I had no reason to think that there was an issue.

Q. And you weren't involved in the pay practices of National Brokers of America before the first wage and hour investigation?

A. No. As I said, I became involved with them at the very end of that, and that was the one meeting I had with Mr. Fedock.

Q. Question number 16 asks you to describe separately and in detail Alan Redmond's role in the operation of National Brokers of America and Bene Market between January 1, 2013, and the present, including but not limited to his starting of work -- pay practices, scheduling of work and workers, and the supervision of employees at each of the aforementioned.

Do you see that?

A. I do.

Q. And you say that you -- answering defendant does not have the information

Page 162

necessary to answer this question.

A. Mr. Redmond established the pay policies, and I really didn't have any knowledge of any of it. The only knowledge I had is when they set up a KPI sheet for this.

Q. What's the last part again?

A. My knowledge of it was when he brought me the information and wanted me to set up the key performance indicators. I really --

Q. So you do have some information that's responsive to this request?

A. The only thing I can say is Mr. Redmond handled it.

Q. Interrogatory Number 18 asks you to describe in detail Stephanie Miller's role in the operation of National Brokers of America and Bene Market between January 1, 2013, and the present, included but not limited to her job title and duties, her role in establishing and administering the company's time, attendance, and pay policy, work roles, scheduling of

Page 163

workers, and state provision of employees at each of the aforementioned.

And your response was: I served as an administrative assistant for Alan C. Redmond working on projects as requested and assigned.

I believe you testified today your role at both companies was the CFO or chief financial officer; is that correct?

A. Yes. I thought you meant on a functional basis because that is what I functioned at is an administrative assistant doing whatever projects he wanted.

Q. But your title was the CFO?

A. Yes.

Q. And you were involved in the establishment of the base pay that included overtime as part of the base pay rate, correct?

A. The base pay was already established. Okay. And that was established based on Mr. Redmond, what he set up. I just

Page 164

taught them how to do it properly.

Q. And when you say you taught them how to do it properly, what did you teach them how to do?

A. How to -- what the proper period that was being covered was. When you have people that are nonaccounting people working on these and establishing, they don't always understand the mechanics of the calculations. So I was going through and setting up the mechanics and showing them how to properly calculate a person's hourly rate and overtime rate based on the base pay principle, which is how he had them paid.

Q. Interrogatory Number 19 asks you to describe in detail Stephanie Miller's awareness or involvement in wage and hour's investigation of any company in which Alan Redmond had an ownership interest, including but not limited to participation in the wage and hour division investigation of National Brokers of America.



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
165–168

Page 165

And your response was that I began working for Mr. Redmond as this investigation wrapped up. I had no involvement in the investigation. And apart from being aware of its existence, I have no knowledge of that investigation.

Do you see that?

A.   Yes.

Q.   Would you agree that this answer should include that you participated in the final conference with Investigator Steve Fedock for the National Brokers of America's investigation?

A.   I guess. Obviously I didn't think that that was part -- you know, showing up at the end and not knowing anything about it. I did not feel that was what you were asking.

Q.   As you sit here today, do you believe that that would now be part of your answer?

A.   I could add it.

Q.   I mean, do you think that information is responsive to the question?

Page 166

A.   Well, I really -- I don't -- other than hearsay, I really don't -- what I saw was the results. So if you view the results as being part of it, absolutely.

Q.   And you were also involved in a telephone conference with Attorney Downing?

A.   I thought that was connected to this current thing, so I didn't think that that was what you were asking about. I thought that was part of this.

MR. RUSH: For the record I keep getting kicked off, but I can hear through Ms. Miller's computer. I'm continually being knocked off for lack of Internet. I'm still on my hotspot. I don't know what's going on.

MS. BLUER: I can only see three people at a time. So I have no idea if -- I'm assuming that the court reporter is there and Mr. Rush is still there. So somebody stop me if it's just me having a good old time by myself.

Page 167

We can go off for just a second because I want to read through a document before I ask some questions. The court reporter can give her hands a rest.

- - - -

(There was a recess in the proceedings from 3:03 p.m. to 3:04 p.m.)

- - - -

BY MS. BLUER:

Q.   Ms. Miller, were you ever given a copy of the Plaintiff's First Request for Production of Documents?

A.   I don't recall.

Q.   So another part of our discovery requests was basically a document where we list certain categories of documents that we're seeking in this case.

Probably most of those requests you won't have any documents to. But at some point you may end up conferring with your attorney and there may be documents that you have that are responsive to items 1 and 2 that address the denials in the -- to the

Page 168

Complaint and your affirmative defenses. And number 23 asks for documents that pertain to your job title, duties, ownership interest, and your involvement in the companies.

So I would just ask you to take a look at those document requests with your attorney and see if you have any documents relevant to any of those requests. But after a quick look, those are certainly the three that I would think you might have documents.

A.   Say it again.

Q.   I'm sorry?

A.   Which ones are you saying?

Q.   So I would think probably numbers 1, 2, and 23. But you should take a look at all of them because I don't know what documents you have. You might have a little treasure trove of memorabilia from all your years at these companies up in your attic somewhere.

A.   I don't believe I do. I didn't take anything with me, but I will be happy to review it again.



Page 169

MS. BLUER: So let's take a 5-minute break so I can have a quick conference with Mr. Mowday and see if there's anything else that I need to cover. Okay?

THE WITNESS: Absolutely.

MS. BLUER: Any objection to that?

MR. RUSH: No objection.

MS. BLUER: Okay. We'll take 5.

- - - -

(There was a recess in the proceedings from 3:07 p.m. to 3:16 p.m.)

- - - -

BY MS. BLUER:

Q.    Ms. Miller, are you ready?

A.    I am.

Q.    I only have really one more question. Although, there may be follow-ups.
Were performance evaluations done for the employees at National Brokers of America?

A.    I don't know.

Q.    Were performance evaluations done for

Page 170

the employees at Bene Market?

A.    I do not know.

MS. BLUER: Those are all the questions I have.

MR. RUSH: I have no questions. I'm sorry. I have one question.

- - - -

EXAMINATION

- - - -

BY MR. RUSH:

Q.    In the Interrogatory you were asked about regarding the investigation -- sorry.
In the Interrogatory you were asked about involving the investigation, was it your understanding that that question only applied to the investigation involving Mr. Fedock?

A.    Yes.

MR. RUSH: Okay. Just making sure. Thank you. That's all.

MS. BLUER: And are any of the responses going to be supplemented?

Page 171

MR. RUSH: Yes.

MS. BLUER: Okay. That's all we have for today, Ms. Miller.

COURT REPORTER: Are e-transcripts okay?

MR. RUSH: Can I just get a digital full size?

MS. BLUER: I can't actually make any representation on that point because our office manager is the only one who is allowed to obligate the government to spend money. So there's an order on file, and she's been in contact with Esquire and it will be taken care of. Because anything can be cost dependent, I can't really even express an opinion.

COURT REPORTER: Okay.

- - - -

(The proceedings were concluded at 3:22 p.m.)

- - - -

Page 172

COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
COUNTY OF ALLEGHENY          )    SS:

I, Kristin Lytle, RPR, do hereby certify that before me, a Notary Public in and for the Commonwealth aforesaid, remotely appeared STEPHANIE MILLER, who then was by me first duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth in the taking of her oral deposition in the cause aforesaid; that the testimony then given by her as above set forth was reduced by me to stenotype in the presence of said witness, and afterwards transcribed by computer-aided transcription.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania on this 12th day of May, 2021.

Kristin Lytle

_____
Kristin Lytle, RPR, Notary Public
In and for the Commonwealth of Pennsylvania

My commission expires April 13, 2023.



STEPHANIE F. MILLER
MARTIN J. WALSH vs BENE MARKET

April 29, 2021
173

Page 173

E R R A T A
S H E E T

I, STEPHANIE MILLER, have read the foregoing pages of my deposition given on April 29, 2021, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line    Should Read              Reason for Change

In all other respects, the transcript is true and correct.

_____
STEPHANIE MILLER

Subscribed and sworn to before me this _____ day of _____, 2021.

_____
Notary Public

        Reference No. KL77522



# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORI CHAVEZ-DEREMER,<br>ACTING SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>    Plaintiff,<br><br>    v.<br><br>BENE MARKET, LLC, NATIONAL BROKERS<br>OF AMERICA INC., ALAN REDMOND, and<br>STEPHANIE MILLER,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 20-4265<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### JOINT STIPULATION REGARDING DAMAGES

The parties, Plaintiff Lori Chavez-DeRemer, and Defendants Bene Market, LLC,

National Brokers of America, Inc., Alan Redmond, and Stephanie Miller (collectively

"Defendants"), by and through counsel, stipulate as follows:

WHEREAS, the Court issued an Order on March 19, 2024, granting Plaintiff's Motion

for Partial Summary Judgment (ECF 114) and resolving all issues in this matter except the total

amount of back wages and liquidated damages owed by Defendants to their employees;

WHEREAS, the Court issued an Order on July 19, 2021 (ECF 38) granting Plaintiff's

Motion for Sanctions;

WHEREAS, the Parties have conferred regarding the total amount of back wages,

liquidated damages, and sanctions to be awarded against Defendants;

WHEREAS, each Party expressly reserved its right to seek appellate review of the Courts

March 19, 2024, Opinion and Order (ECF 113, 114) (and this includes the Court's decision

regarding the affirmative defenses raised by the Defendants), and this Stipulation shall not be construed as a waiver of any such right;

NOW, THEREFORE, IT IS STIPULATED AND AGREED that:

1.  In accordance with the Opinion and Order of March 19, 2024 (ECF 113, 114) this Court should enter judgment against Defendants, jointly and severally, for $403,947.58 in back wages for minimum wage and overtime violations, and $403,947.58 in liquidated damages, for Defendants' violations of the Fair Labor Standards Act between March 26, 2016, and May 20, 2021. If a hearing were held, Plaintiff would provide evidence that would prove that the Defendants owe $403,947.58 in back wages, and therefore an equal amount in liquidated damages, for the employees listed in the Schedule A of the Complaint.

2.  In accordance with the Court's July 19, 2021, Order the Defendants are liable for $240,000 in sanctions.

3.  The Court should enter a total judgment in the amount of $1,047,949.16.

4.  Nothing in this Stipulation shall prevent either party from appealing any and all issues decided in the Court's Opinion and Order granting Plaintiff's Motion for Partial Summary Judgment. (ECF 113, 114).

5.  Both Parties reserve the right to seek further review of any decision of the Court of Appeals.

Respectfully Submitted,


/s/
Norman M. Valz
Law Offices of Norman M. Valz, P.C.
490 Norristown Road, Suite 151
Blue Bell, PA 19422
Telephone No. (215) 765-2424
Facsimile No. (215) 827-5758
nvalz@msn.com

Attorney for Defendants

Jonathan L. Snare
Acting Solicitor of Labor

Samantha Thomas
Regional Solicitor

Adam F. Welsh
Regional Wage & Hour Counsel

Austin Brunson
Attorney

/s/ *Kyle D. Stelmack*
Kyle D. Stelmack
Attorney

Office of the Solicitor
U.S. Department of Labor
1835 Market St.
Mailstop SOL/22
Philadelphia, PA 19103
Telephone No. (215) 861-4856
Facsimile No. (215) 861-5162
stelmack.kyle.d@dol.gov

Attorneys for Complainant

Date: March 28, 2025

# EXHIBIT C

## INDEMNIFICATION AGREEMENT
## BETWEEN STEPHANIE MILLER AND ALAN REDMOND

THIS AGREEMENT, made the $26$ day of $June$ , 2018, Alan Redmond, an adult individual with a business address of 8 The Green Suite A, Dover, Delaware 19901, party of the first part, hereinafter referred to as "Redmond" and Stephanie Miller, an adult individual residing at 485 Knorr Road, Gettysburg, Pennsylvania 17325, party of the second part, hereinafter referred to as "Miller."

WHEREAS, Miller is employed, and has been employed by various entities primarily owned by Redmond; and

WHEREAS, Miller, in the course of her employment, has signed agreements on behalf of the various entities owned by Redmond; and

WHEREAS, Redmond and Miller wish to set forth in writing that Miller is not personally liable for any debts or obligations of the entities primarily owned by Redmond; and

WHEREAS, Redmond intends to hold Miller harmless for any debt, and indemnify her for any costs or losses incurred as a result of the debts and liabilities of entities owned by Redmond.

NOW, THEREFORE, WITNESSETH intending to be bound hereby, the parties agree as follows

1.    **Indemnify**. Redmond shall indemnify and hold harmless Miller from any and all damages arising from or in connection with all of the various entities owned by Redmond, as well as financial indebtedness, governmental indebtedness, and any liability to any Unites States Department of Insurance that would have been incurred by Miller acting as a representative of any of the various companies.

2.    **Maximum liability**. Redmond agrees that his liability under this agreement will be equal to all damages or cost incurred by Miller in any way or as a result of any judgments or costs incurred by Miller in the defending or satisfying any of the potential claims as identified in Paragraph 1 above.

3.    **Defense of Claim**. Redmond shall have the right to assume the defense of any claim or litigation instituted against Miller as a result of her employment with the various entities primarily controlled by Redmond. Miller shall cooperate and participate to the extent necessary to aide Redmond in the defense of the claim. Miller may participate in the claim in her own defense, at her own expense, unless Miller shall have reasonably concluded (upon a written opinion of outside counsel) that there is a reasonable likelihood of a conflict of interest between Redmond and Miller in such action, in which case the fees and expenses of Miller's separate counsel shall be at the expense of Redmond.

4.    **Entire Agreement**. This Agreement embodies and constitutes all of the terms and conditions of the parties' agreement, and supersedes all prior and contemporaneous, oral and written, discussions, negotiations, understandings, and agreements. This Agreement may not be modified in any way other than in writing executed by all of the Parties to this Agreement.

5.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute one instrument. A signature by facsimile or e-mail shall be deemed to be an original signature, provided that the original signature is preserved.

6.    **Governing Law**. This Agreement shall be construed in accordance with and be governed by the internal laws of the Commonwealth of Pennsylvania without regard to principles of conflicts of law.

7. **Venue**. Any disputes regarding this Agreement shall be heard in the Adams County Court of Common Pleas, or in the U.S. District Court for the Middle District of Pennsylvania.

8. **Severability**. If any term of this Agreement shall to any extent be declared invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

9. **Construction**. Each of the undersigned has participated in the drafting of this Agreement, and this Agreement shall not be construed against any party as the drafter.

10. **Authority**. Each of the undersigned has the right and authority to execute this Agreement.

11. **Representations**. The Parties represent and warrant that each has determined that the terms of this Agreement are fair and reasonable and that determination has been based solely upon the independent and informed judgment of each Party. No Party has relied upon or been induced to enter into this Agreement by any statement, representation or warranty not contained within this Agreement, and each Party agrees that all rights and obligations under this Agreement shall be construed as if each Party made a full investigation of all facts related hereto and relied upon their own independent judgment exercised in light of full factual disclosure. In making this determination, each Party has had a full and complete opportunity to discuss this Agreement with independent legal counsel of their own choosing.

12. **Captions**. The titles or captions of the paragraphs or sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, extend or describe the scope of this Agreement or the intent or meaning of any provision hereof.

3

13.    **Attorney Fees and Costs**. If any party to this Agreement files a lawsuit to enforce this Agreement, the prevailing party shall be entitled to their actual attorney's fees and costs incurred in prosecuting or defending against such lawsuit.

**IN WITNESS WHEREOF**, the parties have hereunto have executed the present Agreement the day and year first above written.

**WITNESS:**


_____        _____
                                        **Alan Redmond**


_____        _____
                                        **Stephanie Miller**


4

## VERIFICATION

I, Stephanie Miller, certify under the penalty of perjury that the facts set forth in the foregoing are true and correct to the best of my knowledge, information and belief.

_Stephanie Miller_
STEPHANIE MILLER

## CERTIFICATE OF COMPLIANCE

We, the undersigned, hereby certify that this filing complies with the provisions of the Federal Rule of Civil procedure 5.2 that prohibits filing confidential information and documents that contain personal information.

**VAN DER VEEN, HARTSHORN, LEVIN & LINDHEIM**

May 30, 2025

By:    /s/ Bruce L. Castor, Jr.
       Bruce L. Castor, Jr.


By:    /s/ Timothy E. Possenti
       Timothy E. Possenti

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EUGENE SCALIA, SECRETARY OF LABOR,
UNITED STATE DEPARTMENT OF LABOR, :
                             :

            Plaintiff,         :  **CIVIL ACTION**
                             :
    vs.                     :  **No. 5:20-cv-4265**
                             :

BENE MARKET, LLC, NATIONAL       :
BROKERS, OF AMERICAN, INC, ALAN  :
REDMOND, AND STEPHANIE MILLER  :
                             :
           Defendants.     :

## CERTIFICATE OF SERVICE

I, Timothy E. Possenti, Esquire, do hereby certify that a true and correct copy of the

Defendant's Motion to Open and/or Strike Judgement has been served upon the following persons

in accordance with the Pennsylvania Rules of Civil Procedure:

**Kyle D. Stelmack**
Trial Attorney
Office of the Solicitor
U.S. Department of Labor
Mailstop SOL/22
Philadelphia, PA 19103
Attorney for Plaintiff
Email: Stelmack.Kyle.D@dol.gov
(215) 861-4856
(215) 861-5162 (fax)

**Austin S. Brunson**
Office of the Solicitor
United States Department of Labor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103
Email: Brunson.Austin.s@dol.gov
Attorney for Plaintiff

**Alexander Edward Gosfield**
Department of Labor
1835 Market Street
Ste Mailstop SOL/22
Philadelphia, PA 19103
Email: Gosfield.Alexander.E@dol.gov
Attorney for Plaintiff

**William Richard Allen Rush**
Rush Law Group
38 N. 6th Street
P.O. Box 0758
Reading, PA 19603-0758
Email: wrush@rushlawberks.com
Attorney for Defendant

**Norman M. Valz**
Law Offices of Norman M. Valz, P.C.
490 Norristown Road Ste 151
Blue Bell, PA 19422
Email: nvlaz@msn.com
Attorney for Defendant

**VAN DER VEEN, HARTSHORN, LEVIN & LINDHEIM**


May 30, 2025

By:    /s/ Bruce L. Castor, Jr.
Bruce L. Castor, Jr.



By:    /s/ Timothy E. Possenti
Timothy E. Possenti